**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1689

September Term, 2014

_____

MARYLAND OFFICE OF PEOPLE'S
COUNSEL

v.

MARYLAND PUBLIC SERVICE
COMMISSION

_____

Meredith,
Arthur,
Sharer, J. Frederick

(Retired, Specially Assigned),

JJ.

_____

Opinion by Arthur, J.

_____

Filed: January 28, 2016

In 2013 the General Assembly enacted legislation enabling regulated gas companies to recover the estimated costs of certain infrastructure replacement projects through a surcharge on customer bills. *See* Md. Code (1998, 2010 Repl. Vol., 2014 Supp.), § 4-210 of the Public Utilities Article ("PUA"). Shortly after the statute took effect, Baltimore Gas and Electric Company ("BGE") sought approval of a plan to accelerate the replacement of outdated gas distribution infrastructure and to begin imposing a customer surcharge during the initial implementation of the plan. The Public Service Commission approved the plan, subject to the condition that BGE could not implement the surcharge until it submitted additional information about the individual infrastructure projects that were to be undertaken in 2014.

The Circuit Court for Baltimore City affirmed the Commission's order after the Office of People's Counsel ("OPC") petitioned for judicial review. On appeal, OPC contends: (1) that the Commission erred by authorizing BGE to collect estimated project costs before the completion of each project; and (2) that the Commission acted unlawfully by conditionally approving the plan before the Commission had evaluated the individual projects. We conclude that OPC has shown no basis for reversing the Commission's decisions.

**LEGISLATIVE BACKGROUND**

A.    **Parties to this Appeal**

This appeal involves three entities established by or regulated under the Public Utilities Article of the Maryland Code.

The Maryland Public Service Commission is an independent unit in the executive

branch of State government (PUA § 2-101(b)), with jurisdiction over public service companies that operate utility businesses within the State. PUA § 2-112(a). The Commission's primary duties are to "supervise and regulate" the companies subject to its jurisdiction to "ensure their operation in the interest of the public" and to "promote adequate, economical, and efficient delivery of utility services in the State without unjust discrimination[.]" PUA § 2-113(a)(1)(i).

BGE is a public service company regulated by the Commission. In general, public service companies have a duty to "furnish equipment, services, and facilities that are safe, adequate, just, reasonable, economical, and efficient, considering the conservation of natural resources and the quality of the environment." PUA § 5-303. BGE provides gas service to approximately 655,000 customers across 800 square miles in Baltimore City and central Maryland.

OPC is an agency that acts independently of the Public Service Commission. OPC has a duty to "appear before the Commission and courts on behalf of residential and noncommercial users in each matter or proceeding over which the Commission has original jurisdiction, including a proceeding on the rates, service, or practices of a public service company[.]" PUA § 2-204(a)(2).

B.    **Traditional Rate-Making Procedures**

Title 4 of the Public Utilities Article governs the Commission's rate regulation authority. The Commission has "the power to set a just and reasonable rate of a public service company[.]" PUA § 4-102(b). A public service company has a corresponding duty to "charge just and reasonable rates for the regulated services that it renders." PUA

§ 4-201.

In ordinary ratemaking proceedings, the Commission analyzes data from a prior "test year" to project a utility's future income and expenses:

> The [Public Service Commission] establishes [just and reasonable] rates by examining the utility's income and expenses during a test year, calculating the rate base (the fair value of the property used and useful in rendering service) during that year, determining the utility's cost of capital (its required rate of return), and then multiplying that rate of return against the rate base. The result is the amount of income to which the utility is entitled. To the extent that level of income significantly differs from the test year's net income, the Commission orders an adjustment in the utility's rates – an increase or a decrease, as the case may be.

*Bldg. Owners & Managers Ass'n of Metro. Baltimore, Inc. v. Pub. Serv. Comm'n of Maryland*, 93 Md. App. 741, 753 (1992); *see Office of People's Counsel v. Maryland Pub. Serv. Comm'n*, 355 Md. 1, 8 (1999) (citing *Pub. Serv. Comm'n of Maryland v. Baltimore Gas & Elec. Co.*, 273 Md. 357, 360 n.2 (1974)); *Maryland People's Counsel v. Heintz*, 69 Md. App. 74, 84-85 (1986).

In a conventional proceeding to set rates, the Commission will "calculate the test year's rate base, *i.e.*, 'the fair value of the company's property used and useful' in rendering the service." *Severstal Sparrows Point, LLC v. Pub. Serv. Comm'n of Maryland*, 194 Md. App. 601, 620 (2010) (quoting PUA § 4-101(3)). A public service company ordinarily is not entitled to recover costs simply because the costs were incurred prudently; instead, the Commission normally requires the company to show that the costs relate to an asset "used and useful" in providing service. *E.g. Columbia Gas of Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 224 Md. App. 575, 584-86 (2015) (holding that Commission did not err in denying portion of gas company's request for

rate increase that sought to recover anticipated remediation costs for property not used and useful in providing gas service).

A recent rate case, *In the Matter of the Application of the Washington Gas Light Company for Authority to Increase Its Existing Rates and Charges and to Revise Its Terms and Conditions for Gas Service*, Order No. 84475, 102 Md. PSC 332 (2011), illustrates limits on this traditional recovery model. Along with a rate increase application, Washington Gas Light sought approval of an "Accelerated Pipe Replacement Plan," by which it would finance replacement of its aging gas infrastructure through a customer surcharge. *Id.* at 341, 378-79. The Commission declined to approve that proposed surcharge, commenting that approving a surcharge merely because a company plans to increase its infrastructure investments "would represent a fundamental shift from long-standing rate-making principles[.]" *Id.* at 342; *see also id.* at 383. The Commission determined that the gas company could recover the costs of its plan by filing "more frequent rate cases" to adjust the rate "in smaller increments" after the assets were placed in service. *Id.* at 342.[1]

---

[1] Although the Commission has rejected several requests from utilities to approve surcharges to recover costs contemporaneously with improvements, in 2013 the Commission authorized Pepco, an electric distribution company, to impose a "tracker" surcharge mechanism to finance accelerated projects to improve grid resiliency. On an appeal resulting from that decision, this Court affirmed the Commission's order without reaching the issue of whether the Commission has exceeded its statutory authority in approving the surcharge, as that issue had not been raised before the Commission. *Maryland Office of People's Counsel v. Maryland Pub. Serv. Comm'n*, ___ Md. App. ___, No. 2173, Sept. Term 2014, slip op. at 26-28 (filed Dec. 15, 2015).

## C.     Enactment of the 2013 STRIDE Law

Between 2011 and 2013, the General Assembly considered a series of bills that would empower the Public Service Commission to authorize gas companies to promptly recover infrastructure replacement costs through a customer surcharge.[2] The 2013 General Assembly enacted "An Act Concerning Gas Companies – Rate Regulation – Infrastructure Replacement Surcharge." The proposal was commonly referred to as the Strategic Infrastructure Development and Enhancement (STRIDE) law. The law took effect on June 1, 2013. *See* 2013 Md. Laws, ch. 161, § 2.

The legislation added section 4-210 to the Public Utilities Article. This new section includes an express statement of legislative intent: "It is the intent of the General Assembly that the purpose of this section is to accelerate gas infrastructure improvements in the State by establishing a mechanism for gas companies to promptly recover reasonable and prudent costs of investments in eligible infrastructure replacement projects separate from base rate proceedings." PUA § 4-210(b).

Pursuant to this section, a gas company may file "a plan to invest in eligible infrastructure replacement projects" accompanied by "a cost-recovery schedule . . . that includes a fixed annual surcharge to recover reasonable and prudent costs" of those projects. PUA § 4-210(d)(1). A plan filed by a gas company must include: "(i) a time line for the completion of each eligible project; (ii) the estimated cost of each project; (iii) a description of customer benefits under the plan; and (iv) any other information the

---

[2] *See* S.B. 8, 2013 Reg. Sess. (cross-filed as H.B. 89); S.B. 541, 2012 Reg. Sess. (cross-filed as H.B. 662); S.B. 332, 2011 Reg. Sess. (cross-filed as H.B. 856).

Commission considers necessary to evaluate the plan." PUA § 4-210(d)(2).

The Commission is required to "take a final action to approve or deny the plan" within 180 days after the gas company files the plan. PUA § 4-210(e)(1)(ii). The Commission "may approve a plan if it finds that the investments and estimated costs of eligible infrastructure replacement projects are: (i) reasonable and prudent; and (ii) designed to improve public safety or infrastructure reliability over the short term and long term." PUA § 4-210(e)(3).

The term "[e]ligible infrastructure replacement" is defined as "a replacement or an improvement in an existing infrastructure of a gas company that: (i) is made on or after June 1, 2013; (ii) is designed to improve public safety or infrastructure reliability; (iii) does not increase the revenue of a gas company by connecting an improvement directly to new customers; (iv) reduces or has the potential to reduce greenhouse gas emissions through a reduction in natural gas system leaks; and (v) is not included in the current rate base of the gas company as determined in the gas company's most recent base rate proceeding." PUA § 4-210(a)(3).

The cost-recovery schedule associated with a plan must include a fixed annual surcharge, which may not exceed $2 per month for each residential customer, and which is capped pursuant to a formula for non-residential customers. PUA § 4-210(d)(4)(i). After the approval of a plan, the gas company must file an annual reconciliation "to adjust the amount of a surcharge to account for any difference between the actual cost of a plan and the actual amount recovered under the surcharge." PUA § 4-210(h). A surcharge established by the cost-recovery schedule "shall be in effect for 5 years from

the date of initial implementation of an approved plan." PUA § 4-210(g)(1)(i).

The statute sets forth specific requirements for calculating the "estimated cost" of each eligible project included in the plan. PUA § 4-210(d)(3). Of central importance to the instant appeal is a statutory provision that specifies when the estimated project costs may be recovered through the surcharge. Subparagraph (d)(3)(ii) provides that the "*estimated* project costs . . . are collectible *at the same time* the eligible infrastructure replacement *is made*." PUA § 4-210(d)(3)(ii) (emphasis added).[3]

## FACTUAL AND PROCEDURAL BACKGROUND

### A. BGE's Application

On August 2, 2013, one month after the effective date of the statute, BGE submitted an "Application . . . for Approval of a Gas System Strategic Infrastructure Development and Enhancement Plan and Accompanying Cost Recovery Mechanism." According to the application, BGE wished to "accelerate significantly" the replacement of "gas system assets that have reached the end of their useful life," in order to "enhance safety and reliability for its customers."

BGE proposed to completely replace the oldest and most leak-prone components

---

[3] In full, subparagraph (d)(3)(ii) states: "The estimated project costs described in subparagraph (i) of this paragraph are collectible at the same time the eligible infrastructure replacement is made." Subparagraph (i) provides that when calculating the estimated cost of each project, the gas company shall include the pretax rate of return on the company's investment in the project, as well as depreciation and property taxes associated with the project. PUA § 4-210(d)(3)(i). Subparagraph (i) cross-references paragraph (2) of the subsection, which states that "[a] plan under this subsection shall include . . . the estimated cost of each project[.]"

of its gas distribution system over a period of 30 years.  The application stated that BGE

planned to replace the entire population of five "asset classes."[4]  According to BGE,

those assets had been installed many decades ago, in most cases more than 50 years

earlier.

BGE planned to invest a total of $400 million during the initial five-year period

from 2014 to 2018.  BGE proposed a monthly surcharge of $0.32 per residential customer

and $1.87 per non-residential customer, beginning February 2014.  The surcharge would

then increase each year until 2017, when it would be capped at $2 per month for

residential customers and $11.55 per month for non-residential customers.

Upon receiving the application, the Commission suspended the proposed rates and

initiated proceedings to evaluate the plan.  OPC participated in the proceedings to

represent the interests of ratepayers.[5]

B.      **Hearing Before the Commission**

The parties presented testimony and arguments at an evidentiary hearing on

November 12, 13, and 14, 2013, in accordance with PUA § 3-107 and COMAR 20.07.02.

In support of the application, four BGE executives testified regarding the details of

_____

[4] The application identified the assets as: "(1) pre-1982 plastic 'Ski-Bar' service risers, (2) Bare Steel Main, (3) Cast Iron Main, (4) Bare Steel Services, and (5) Copper Services."  In industry terminology, "mains" are gas distribution lines that serve as a common source for "service lines" that supply gas to individual customer meters. "Risers" are components that protect the service line as it transitions upward from below ground to the customer's meter above the ground.

[5] Maryland Energy Group and W.R. Grace & Co., groups comprised of large industrial and non-profit energy users, also intervened.  Those parties submitted an initial brief, but presented no witnesses at the eventual hearing.

the proposed infrastructure replacements, the expected customer benefits, and the customer surcharge. According to BGE's witnesses, the five "asset classes" described in the application represented only 21 percent of BGE's gas distribution system mileage, but had accounted for 73 percent of all gas leak repairs in 2012. BGE estimated that the plan would roughly double the existing rate at which BGE had been replacing its pipelines.

BGE's proposal envisioned that customers would begin paying a surcharge on their monthly bills contemporaneously with, and in many cases after, its upgrades of the gas-delivery infrastructure. For example, the company expected to invest $65 million in its STRIDE projects in 2014 and to collect $3 million from customers that year. According to BGE, the total charges collected over five years would cover less than 10 percent of BGE's cumulative investments in the projects. The company would then recover the remainder of the costs over the useful life of the replaced assets.

OPC offered testimony from Dr. Karl Pavlovic, an energy industry consultant, who recommended that the Commission deny the application. Among other things, Dr. Pavlovic contended that BGE's plan was deficient in that it did "not identify or specify the investment costs" for replacing the targeted assets.

Dr. Pavlovic opined that BGE's proposed cost-recovery mechanism would contravene the established ratemaking principle that "investment cost recovery from rate payers does not begin until the associated assets are placed in service and used and useful." He interpreted language from PUA § 4-210(d)(3)(ii), stating that "estimated project costs . . . are collectible at the same time the eligible infrastructure replacement is made," to mean that "project costs can be included in the surcharge once a project is

*completed*." (Emphasis added.) According to Dr. Pavlovic, the surcharge should not be based on future cost projections, but "should be calculated on actual historical costs in a [12] month period and collected over the subsequent 12 month period." The foundation of his interpretation was his understanding that cost recovery under the new statute should be "consistent with the principles underlying the revenue requirement model[.]"

Disputing Dr. Pavlovic's interpretation, BGE and its witnesses contended that the intent of the legislation was to accelerate improvements by providing for prompt cost recovery contemporaneously with the implementation of the projects.

The Commission's staff also participated in the hearing pursuant to PUA § 3-104(e). A staff engineer commented that BGE's submissions were not detailed enough for staff to evaluate whether the plan met all statutory requisites for approval, because BGE had not identified specific projects to be implemented. The staff recommended that the Commission direct BGE to present a more detailed list of proposed 2014 projects within 30 days after an initial order, so that the Commission staff could ensure that each project met eligibility requirements. A BGE representative agreed to supply the remaining necessary information after the conclusion of the case.

## C.  The Commission's Conditional Approval of the Application

On January 29, 2014, the final day of the 180-day period for consideration of the application (*see* PUA § 4-210(e)(1)), the Commission issued Order No. 86147. The Commission set forth its findings and conclusions in a 40-page opinion that accompanied the order. The Commission declared: "[W]e find that BGE's Application meets the requirements of [s]ection 4-210 and we conditionally grant the Company's request. . . .

-10-

We approve the proposed cost recovery surcharge subject to the requirements set forth in [s]ection 4-210 and this Order."

The Commission nevertheless found BGE's submissions to be lacking in a few important respects. Specifically, the Commission found that the BGE had not sufficiently identified the "time line for completion of *each* eligible project" and the "estimated cost of *each* project" pursuant to PUA § 4-210(d)(2)(i) and (ii). (Emphasis added.) As a result, the Commission could not yet determine whether the proposed investments and estimated costs were "reasonable and prudent" to qualify for approval under PUA § 4-210(e)(3). The Commission wrote:

> According to BGE, the initial five year (2014-2018) estimated cost for its STRIDE Plan will be $400 million. BGE takes the position that each vintage asset class represents a "project." Thus, according to BGE, the timeline for each project ranges from three years for the Ski-Bar risers to 30 years for cast iron main and copper services. However, we conclude that the term "project" in Section 4-210(d)(2) means something more specific, concrete and practical than a broadly outlined plan. In fact, the Company essentially concedes as much, since BGE agreed to file a detailed list of 2014 projects within 30 days of a Commission order approving its Plan, as Staff recommended, with the same level of detail as is found in the Company's annual gas distribution system report. In order for the Commission to conclude that each project is reasonable and prudent both from an infrastructure and cost standpoint, we condition approval of BGE's Plan . . . upon a Commission review of the time line and costs for each of BGE's projects.

The Commission directed BGE to file a list of projects to be initiated in 2014, along with the time lines and estimated costs for each project. The Commission gave BGE 30 days to file the list. It ordered that BGE could not implement the 2014 surcharge until after the Commission had approved the 2014 project list, time lines, and cost estimates. The Commission required BGE, each year thereafter, to submit information

-11-

about projects for the upcoming year.

Addressing the question of statutory interpretation that had dominated much of the proceeding, the Commission concluded that BGE would not be required to await the completion of each infrastructure project before collecting the surcharge. The Commission recognized that "the new STRIDE statute represents a departure from traditional ratemaking principles." The Commission emphasized that the express legislative purpose was that "reasonable and prudent costs" could be "recovered 'separate from base rate proceedings.'" Consistent with that reading, the Commission determined that the statutory provision "that estimated project costs 'are collectible at the same time the eligible infrastructure replacement is made' . . . authorizes contemporaneous cost recovery at the time eligible infrastructure replacement work is being performed."

The Commission clarified, however, that "estimated project costs may not be recovered by the surcharge until BGE has begun making its initial STRIDE replacements." In a footnote, the Commission added that it anticipated that approval of those submissions would be completed "at an Administrative Meeting after Staff and the Commission have had a reasonable time to review BGE's project filing."

At the conclusion of Order No. 86147, the Commission ordered that BGE's STRIDE plan was "approved, subject to the acceptance by BGE of the conditions contained in this Order[.]" The Commission also ordered BGE to notify the Commission within 30 days whether it would accept all conditions contained in the order. Finally, the Commission ordered that the plan would be denied if BGE failed to do so.

-12-

D.     **Developments after the Conditional Approval**

On February 21, 2014, BGE formally notified the Commission that it had accepted the conditions imposed by Order No. 86147.  BGE submitted a list of 55 projects to be initiated in 2014, "including project description, location, estimated cost, type of infrastructure replaced, risk assessment . . . , estimated project completion date[,] and reasons for replacement."  Citing changed circumstances since the initial application, BGE estimated a decrease in capital expenditures for 2014 projects.  BGE also asked the Commission to authorize higher surcharges for residential customers and for most categories of non-residential customers.

Shortly thereafter, on February 27, 2014, OPC filed a petition for judicial review in the Circuit Court for Baltimore City.  Both the Commission and BGE filed responses.

Meanwhile, OPC submitted comments to the Commission regarding BGE's 2014 projects.  The parties again appeared at the Commission's administrative meeting on March 26, 2014, at which the Commission heard arguments, but did not receive any new sworn testimony.  The Commission's staff announced that it had reviewed the project list and recommended that the Commission approve the completed application.  The commissioners voted to approve the projects and to authorize BGE to impose the requested surcharges effective April 2014.  The Commission issued a letter order after the meeting to formalize its decision.

In the action for judicial review in the circuit court, OPC challenged aspects of both Order No. 86147 and the March 26, 2014, letter order.  Among other things, OPC contended that the Commission had erred by concluding that the statute authorized BGE

-13-

to collect estimated project costs before the proposed projects were completed and by conditionally approving the plan before the Commission had received a list of projects. At a hearing on September 5, 2014, the circuit court issued an oral decision denying OPC's petition. On September 12, 2014, the circuit court entered an order affirming Order No. 86147.

OPC noted a timely appeal from the circuit court's judgment.

## QUESTIONS PRESENTED

OPC presents the following two questions, which we quote:

1. Did the Commission act unlawfully and in contravention of PUA § 4-210(d)(3)(ii), when it issued Order No. 86147, in which the Commission authorized BGE to begin collection of the estimated cost of each eligible infrastructure replacement before it was made?

2. Did the Commission act unlawfully when it issued Order No. 86147, in which the Commission approved BGE's STRIDE Plan even though the Commission found that the Plan did not consist of "projects" as expressly required by PUA §§ 4-210(d)(1) and (e)(3)?

As discussed below, OPC has failed to show that the Commission erred or otherwise acted unlawfully.

## DISCUSSION

## I.

The Public Utilities Article "sets forth the limited 'scope of review' . . . over decisions by the Public Service Commission." *Town of Easton v. Pub. Serv. Comm'n*, 379 Md. 21, 30 (2003). It states: "Every final decision, order, or regulation or the Commission *is prima facie correct* and *shall be affirmed* unless *clearly shown* to be: (1) unconstitutional; (2) outside the statutory authority or jurisdiction of the Commission; (3)

made on unlawful procedure; (4) arbitrary or capricious; (5) affected by other error of law; or (5) if the subject of review is an order entered in a contested proceeding after a hearing, unsupported by substantial evidence on the record considered as a whole." PUA § 3-203 (emphasis added).

The appellate court's task is to review the Commission's decision, not the decision of the circuit court. *See Mid-Atlantic Power Supply Ass'n v. Maryland Pub. Serv. Comm'n*, 143 Md. App. 419, 432 (2002).

### A.     Commission's Interpretation of Cost Collection Provisions

As the primary issue in this appeal, OPC contends that an "error of law" affected the Commission's order. OPC specifically contends that the Commission erred when it interpreted the statute as authorizing a gas company to recover estimated project costs after the initial implementation of the projects and before the completion of each project. OPC's challenge concerns the language of a provision describing the "estimated costs" included with a gas company's infrastructure replacement plan: "The estimated project costs . . . are collectible at the same time the eligible infrastructure replacement is made." PUA § 4-210(d)(3)(ii).

In a section of the opinion titled "OPC's Objections," the Commission wrote:

OPC argued that project costs may not be included in the surcharge until projects are completed. The traditional rate base recovery models have only allowed utilities to collect revenues based upon assets that are currently used and useful. However, in this case there is legislation that specifically states that the estimated project costs "are collectible at the same time the eligible infrastructure replacement is made," and that reasonable and prudent costs shall be recovered "separate from base rate proceedings." The statute authorizes contemporaneous cost recovery at the time eligible infrastructure replacement work is being performed.

-15-

The parties disagree over the appropriate weight that should be given to this interpretation.

Generally, "[a] great deal of discretion is necessarily vested in the Commission in order that it may properly discharge its important and complex duties." *People's Counsel v. Pub. Serv. Comm'n*, 52 Md. App. 715, 722 (1982). "Because the Commission is well informed by its own expertise and specialized staff, a court reviewing a factual matter will not substitute its own judgment on review of a fairly debatable matter." *Communications Workers of Am. v. Pub. Serv. Comm'n*, 424 Md. 418, 433 (2012) (citing *Pub. Serv. Comm'n of Maryland v. Baltimore Gas & Elec. Co.*, 273 Md. 357, 362 (1974)). In contrast to administrative findings of fact, questions of law, including the proper construction of a statute, are subject to more plenary review by the courts. *Office of People's Counsel v. Maryland Pub. Serv. Comm'n*, 355 Md. 1, 14 (1999). An agency's interpretation of a statute that it administers "may be entitled to some deference," but "[t]hat deference is, by no means, dispositive" and not as great as the deference owed to factual findings. *Id.*

"The weight to be accorded an agency's interpretation of a statute depends upon a number of considerations." *Id.* at 17 (quoting *Baltimore Gas & Elec. Co. v. Pub. Serv. Comm'n*, 305 Md. 145, 161 (1986)) (quotation marks omitted). These considerations include whether agency officials adopted their view "soon after its passage" (*Office of People's Counsel v. Maryland Pub. Serv. Comm'n*, 355 Md. at 16), whether the interpretation "has been applied consistently and for a long period of time," "the extent to which the agency engaged in a process of reasoned elaboration in formulating its

interpretation," and "the nature of the process through which the agency arrived at its interpretation[.]" *Id.* at 17 (quoting *Baltimore Gas & Elec. Co. v. Pub. Serv. Comm'n*, 305 Md. at 161-62) (quotation marks omitted).

OPC urges this Court to grant little or no weight to the Commission's interpretation of PUA § 4-210(d)(3)(ii), because these proceedings presented the Commission with its "first opportunity" (*Wallace H. Campbell & Co., Inc. v. Maryland Comm'n on Human Relations*, 202 Md. App. 650, 671 (2011)) to construe the newly enacted statute. Although this 2014 interpretation of the 2013 law had not yet been applied consistently over a long period of time, other relevant considerations indicate that the Commission's interpretation deserves deference.

OPC asserts that the Commission provided "little (if any) elaboration in formulating its interpretation." According to OPC, "the Commission's discussion and interpretation – in its entirety – of . . . PUA § 4-210(d)(3)(ii)" consists of a single paragraph. We disagree that the Commission's analysis was so limited. Earlier portions of the opinion extensively discussed competing interpretations of the provision offered by the parties. The opinion included analysis of section 4-210 in its entirety, from which the Commission drew inferences regarding how the legislature intended to motivate gas companies to accelerate infrastructure replacements. The opinion later cited subparagraph (d)(3)(ii) to support the conclusion that "estimated project costs may not be recovered by the surcharge until BGE has begun making its initial STRIDE replacements[.]" As a whole, the well-considered opinion provided a reasoned elaboration of this provision within its statutory context.

-17-

Further examination of the record reveals that the adversarial presentation of this issue sharpened the Commission's statutory analysis. In addition to written testimony regarding the meaning of the subparagraph, one of the commissioners examined OPC's witness, Dr. Pavlovic, regarding the OPC's preferred interpretation. OPC's expert testified that the statute's reference to the "time" when a gas company makes a replacement could refer to a number of things, including "when the underlying asset is in the process of being put in the ground" or "not until . . . the asset is in the ground and functioning." He opined that the Commission should equate the time the eligible infrastructure replacement "is made" with the time that the replacement has been "placed in service."

The commissioner asked Dr. Pavlovic to explain why the statute would refer to the recovery of "estimated" costs if the gas company could not collect the costs until the replacement had been "placed in service," when the actual costs would already be known. Dr. Pavlovic commented that the reference to a cost estimate amounted to "an inconsistency or ambiguity as it were in the legislation." He encouraged the Commission to use its own expertise where the statute was "unclear" and to resolve the question by applying principles of the conventional recovery model. The commissioner, by contrast, expressed doubt that there would be any need for the new statute if the traditional cost-recovery principles continued to apply:

> [COMMISSIONER:] But coming back to your testimony, you would have liked the statute to have said placed in service before cost could be recovered?
>
> DR. PAVLOVIC: I would like the statute to have said placed in

| | |
|---|---|
| | service, recovery – this provision is talking about the recovery. Recovery will begin when the asset is placed in service. |
| [COMMISSIONER:] | I know you're not a lawyer, but a lot of your testimony deals with your view of the statute. . . . That's why I'm trying to clarify in my mind, if the statute wanted to say placed in service, it could have easily said placed in service. That's a pretty common phrase in utility regulation; is it not? |
| DR. PAVLOVIC: | Yes. |
| [COMMISSIONER:] | Are you familiar at all with the concept that if somebody thinks part of the statute is ambiguous, that you have to try to read the statute as a whole so that no terms are rendered meaningless or incorrect? |
| DR. PAVLOVIC: | Yes. |
| [COMMISSIONER:] | So if we took your reading of the statute that the recovery only occurs after the asset is placed in service, what do we do with the estimated budget cost of that same subsection of the statute? |

After reading the language once more, Dr. Pavlovic commented, "the statute, it's difficult here." He concluded his answer by saying: "I mean to square this provision with, as I said, what I understand to be the overall intent, which is to apply the traditional revenue requirement model to the recovery of this investment, but to – in a more timely manner, I can't make these completely consistent and I certainly admit that."

Like the Commission's written explanation of its decision, the hearing transcript demonstrates that the agency engaged in a thorough reasoning process in formulating its interpretation. Normally, this Court owes deference when an agency has "carefully considered the statutory language during an adversarial adjudicatory proceeding and

issued [a] formal, written opinion[] that detail[s] the reasons for reaching its conclusion," as long as the agency's interpretation does not clearly violate the wording of the statute. *Injured Workers' Ins. Fund v. Subsequent Injury Fund*, 222 Md. App. 347, 357 n.7 (concluding that this Court normally would defer to an interpretation expressed by the Workers' Compensation Commission in written opinion after adversarial hearing, but ultimately holding that the relevant language unambiguously supported the agency's interpretation), *cert. granted*, 443 Md. 234 (2015).

Giving weight to the Commission's interpretation would be particularly appropriate here where even OPC, the party challenging the Commission's interpretation, advanced the position that the statute was ambiguous and encouraged the agency to use its expertise to determine the meaning of potentially ambiguous terms. *See Baltimore Gas & Elec. Co. v. Pub. Serv. Comm'n*, 305 Md. at 159 (stating that the presence of a vague term susceptible to more than one interpretation "in an administrative statute such as the Public Service Commission Law suggests that the General Assembly intended to entrust the formulation of specific standards to the technical expertise of those charged with enforcing the statute"). As compared to this Court, the Commission certainly possesses far greater expertise in deciding how to accomplish the legislative purpose of accelerating infrastructure improvements through a surcharge.

We are unconvinced that the Commission's interpretation carries minimal or no authoritative weight. Because the Commission has "clearly demonstrate[d] that it has focused its attention on the statutory provisions in question, thoroughly addressed the relevant issues, and reached its interpretation through a sound reasoning process," its

-20-

interpretation should "be accorded the persuasiveness due a well-considered opinion of an expert body." *Office of People's Counsel v. Maryland Pub. Serv. Comm'n*, 355 Md. at 17 (quoting *Baltimore Gas & Elec. Co. v. Pub. Serv. Comm'n*, 305 Md. at 161-62) (quotation marks omitted). As explained below, however, even upon a plenary review of this issue, we would arrive at the same answer as the Commission.

### B. Meaning of Section 4-210(d)(3)(ii) of the Public Utilities Article

When interpreting a provision of the Public Utilities Article, as with any other statute, we first examine the ordinary meaning of the enacted language, "reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Peters v. Early Healthcare Giver, Inc.*, 439 Md. 646, 665 (2014) (quoting *Nichols v. Suiter*, 435 Md. 324, 339 (2013)) (quotation marks omitted). A court may neither add nor subtract words to alter the meaning of statutory terms and must avoid forced or subtle constructions that limit or extend a statute's application. *See, e.g.*, *Clipper Windpower, Inc. v. Sprenger*, 399 Md. 539, 553 (2007). "In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *Espina v. Jackson*, 442 Md. 311, 322 (2015) (citations omitted); *Lockshin v. Semsker*, 412 Md. 257, 276 (2010).

OPC contends that the Commission violated these principles by "improperly substitut[ing] its own preferred words, phrases, and tenses that the Commission believed the General Assembly *should* have chosen." OPC highlights some differences between the words of PUA § 4-210(d)(3)(ii) ("estimated project costs . . . are collectible at the

same time the eligible infrastructure replacement is made") and words from the conclusion stated in the opinion: "The statute authorizes contemporaneous cost recovery at the time eligible infrastructure replacement work is being performed." According to OPC, the Commission "rewrote" the provision to say that "estimated project costs . . . are collectible at the time the eligible infrastructure replacement work, including preconstruction planning, has begun or is being performed."[6]

But even as it criticizes the Commission for rewriting (or, more precisely, paraphrasing) the statutory language, OPC then goes on to offer its own paraphrase of PUA § 4-210(d)(3)(ii). According to OPC, subparagraph (d)(3)(ii) means that "STRIDE Project costs may *not* be collected from residential ratepayers in the STRIDE surcharge until (and unless) each STRIDE project for which ratepayers are being charged *has been 'made*,' or completed." (Emphasis added.)

OPC's analysis focuses most acutely upon a single word – "made." OPC asserts that "the verb 'made'" was "used in its simple past tense." Citing online dictionaries, OPC tells us: "'Made' means 'built, formed, or shaped in a particular way.' . . . Further, 'made is the 'simple past tense and past participle of 'make,' which means that it refers to

---

[6] The opinion does not mention cost recovery during a "preconstruction planning" phase. OPC's inaccurate characterization is not based upon the language of the opinion but upon certain testimony from BGE witnesses. Later in the opinion, the Commission specifically clarified that estimated costs "may not be recovered by the surcharge until BGE has begun making its initial STRIDE replacements," which we interpret to mean that BGE may not recover the costs until construction work has begun.

something that has *already* been 'built, formed or shaped in a specified way.'"[7]

OPC's parsing of the sentence is flawed. An example of the verb "to make" used in the "simple past tense" is: "The gas company made a replacement." Subparagraph (d)(3)(ii), however, does not employ that formulation. Instead, the subparagraph uses the word "made" as a participle along with the present tense verb "is" – the estimated costs become collectible at the same time the replacement "is made." In other words, subparagraph (d)(3)(ii) uses the verb "to make" in the present tense, but in the passive voice. A simplified example of that passive formulation is: "The replacement *is made* by the gas company." The active-voice equivalent of that sentence is: "The gas company *makes* the replacement," using the present tense. Translated from the passive to the active voice, the meaning of "at the same time the eligible infrastructure replacement *is made*" is substantially similar to "at the same time the gas company *makes* the eligible infrastructure replacement."

OPC's interpretation might be accurate if the statutory language had employed the passive voice and the present perfect tense, so that it provided that estimated project costs become collectible at the same time "the eligible infrastructure replacement *has been made*." That reading, however, would not reflect the language as actually enacted, in the passive voice and present tense.

_____

[7] In support of this proposition, OPC cites a web page accessed on July 20, 2015: http://dictionary.reference.com/browse/made?s=t. The source does say that the word "made" is the "simple past tense and past participle of make." It does not say that the meaning of the word is restricted to "something that has *already* been" made. Nor does it discuss the meaning of the phrase "*is made*," which is the actual language in the pertinent statute.

Our ultimate question of interpretation is to determine when the "estimated project costs . . . are collectible[.]" PUA § 4-210(d)(3)(ii). The statute directs that those estimated costs may be collected "at the same the eligible infrastructure replacement is made." *Id.* The Commission interpreted this phrase, within the statutory context, to mean that costs may be collected once a gas company *begins* making the infrastructure replacements. OPC contends that the only permissible reading of this sentence is that the gas company may not collect the costs until it *finishes* making the replacements.

Depending on the context, a reference to the "time" something "is made" could refer to either the period of time during which something is being made ("we'll listen to music while dinner is made") or the point in time when the process of making something has been completed ("dinner is made; let's eat"). In subparagraph (d)(3)(ii), the potential ambiguity is resolved by the clarifying phrase "at the *same* time." Under OPC's interpretation, the "time" an infrastructure replacement "is made" represents a discrete instant: after that moment, the gas company may recover a surcharge, but before that moment, the company may not recover anything. The statute, however, contemplates that the surcharge will be paid not at one discrete time, but over a long period of time. Specifically, the surcharge "shall be in effect for 5 years from the date of initial implementation of an approved plan," and the surcharge may continue for certain ongoing projects even after that five-year period. PUA § 4-210(g)(1).

Under OPC's reading, a gas company would never be permitted to collect the costs "at the same time" the replacement "*is* made"; it could recover costs only after the replacement *has been* made or completed. The timing of the two actions (replacement

-24-

and collection) would always be different and would never be "the same." OPC's interpretation at worst contradicts the meaning of the phrase "at the same time," and at best renders that term meaningless.[8] Under fundamental principles of construction, we must reject OPC's interpretation because it fails to account for the General Assembly's use of the word "same." *See, e.g., Chow v. State*, 393 Md. 431, 453-55 (2006) (rejecting interpretation of statute that would render word "transfer" in statute meaningless or nugatory).

Of course, to understand the meaning of statutory language, we must look beyond individual words and clauses to the larger context, including other surrounding provisions and the apparent purpose of the enactment. *See, e.g., Williams v. Peninsula Regional Med. Ctr.*, 440 Md. 573, 580-81 (2014) (citing *Lockshin*, 412 Md. at 275-76). This additional context casts further doubt upon OPC's suggested interpretation.

This sentence in PUA § 4-210(d)(3)(ii) does not describe the collection of mere "costs," but the collection of "estimated project costs" that are to be included in an application. Subsection (d), which governs the contents of a plan filed by a gas company, specifies that a plan must include "a cost-recovery schedule associated with the plan that includes a fixed annual surcharge on customer bills to recover reasonable and prudent costs of proposed eligible infrastructure replacement projects." PUA § 4-210(d)(1)(ii).

---

[8] At the judicial review hearing, the circuit court judge proposed the following hypothetical: "Suppose I said to my granddaughter, 'Be quiet while the fudge is made.'" Counsel for OPC replied that "in that context," he "would concede" that the word "while" is a "durational term," which implies that that the sentence refers to the time the fudge "is being made." Much like the word "while," the phrase "at the same time" conveys the duration of the action.

Subsection (d) is predominantly forward-looking. The gas company files a "plan" for "proposed . . . projects" along with "estimated" costs. Overall, this language suggests that a surcharge reflecting estimated costs may be recovered before the gas company has completed all of the work and before the actual costs are known.

Other portions of the statute are explicitly backward-looking. Most notably, the statute requires a gas company, after the approval of a plan, to file an annual reconciliation "to adjust the amount of a surcharge to account for any difference between the *actual cost* of a plan and the actual amount recovered under the surcharge." PUA § 4-210(h) (emphasis added). This feature of the statute strengthens the implication that the gas company can begin to recover its costs before it has completed all of the work and before the actual amount of the costs are known.

Subsection (d) is not the only provision to address cost collection. Elsewhere, the statute directs: "A surcharge under this section shall be in effect for 5 years from the date of initial implementation of an approved plan." PUA § 4-210(g)(1)(i). Under the most reasonable reading of this sentence, a customer surcharge begins to take effect on the date that the gas company initially implements its plan. Under OPC's interpretation, the surcharge would not be "in effect" from the initiation of the approved plan, but would take effect much later, after the completion of projects.

At best, OPC's reading is in substantial tension with many features of the statute. OPC's interpretation would render the word "same" in PUA § 4-210(d)(3)(ii) essentially meaningless; it struggles to explain why the provision refers to "estimated" costs that would need to be adjusted to reflect the "actual" costs at the end of the year; and it

-26-

substantially undermines the overlapping direction that the surcharge mechanism takes effect "from the date of initial implementation[.]"  PUA § 4-210(g)(1)(i).  By contrast, the Commission's interpretation is consistent with section 4-210 in its entirety.

### C.    Effect of "Just and Reasonable Rate" Definition of PUA § 4-101

OPC largely ignores the tension between its strained interpretation of subparagraph (d)(3)(ii) and the surrounding provisions.  OPC does, however, encourage this Court to look beyond the statute and to infuse the reading of section 4-210 with other factors usually considered in the traditional rate-of-return regulatory model.  We reject that approach because, by all objective indications, the STRIDE law represents a departure from that conventional model.

OPC posits that, because a surcharge is a "rate," the surcharge must also meet the enumerated requirements of a "just and reasonable rate."  Within the rate regulation title, the term "'just and reasonable rate' means a rate that: (1) does not violate any provision of [the Public Utilities A]rticle; (2) fully considers and is consistent with the public good; and (3) . . . will result in an operating income to the public service company that yields, after reasonable deduction for depreciation and other necessary and proper expenses and reserves, a reasonable return on the fair value of the public service company's property used and useful in providing service to the public."  PUA § 4-101.  In OPC's view, the language that "estimated project costs are collectible . . . at the same time the eligible infrastructure replacement is made" should be treated as restating the requirement of PUA § 4-101(3) that a public service company is authorized to earn a return on property that is "used and useful" in providing service to the public.In response, the Commission

-27-

argues that it makes little sense to attempt to "reconcile" the new STRIDE surcharge mechanism with traditional recovery models. The Commission concedes that, in the traditional ratemaking context, the Commission "disfavors tracker surcharges" that permit a utility to begin recovering costs from ratepayers immediately upon expenditure. The Commission argues, however, that the General Assembly "has expressed a clear desire that the Commission deviate from that position" when evaluating surcharges under the STRIDE law because the language of PUA § 4-210 makes it "quite clear" that "the STRIDE Act was intended as an exception to traditional ratemaking."

OPC's argument has a number of infirmities. First and foremost, the defined term "just and reasonable rate" does not appear in section 4-210. The General Assembly easily could have incorporated the "used and useful" component by adding the defined term "just and reasonable rate" to surcharge provisions of the STRIDE law. We must respect the legislature's choice not to do so. *See, e.g.*, *Toler v. Motor Vehicle Admin.*, 373 Md. 214, 223-24 (2003) (explaining that decision to employ defined term in one section but different term in another part of statute dealing with same overall subject usually indicates that legislature intends two different meanings).

The statute here conspicuously indicates the opposite of any intention to make the surcharge comport with the methods of traditional base rate cases. The General Assembly expressly stated its intent to "establish[] a mechanism for gas companies to promptly recover reasonable and prudent costs . . . *separate from base rate proceedings*." PUA § 4-210(b) (emphasis added). The statute ensures this separation by prohibiting the Commission from "consider[ing] a revenue requirement or rate-making issue that is not

-28-

related to the plan when reviewing a plan for approval or denial unless the plan is filed in conjunction with a base rate case." PUA § 4-210(e)(5).

The General Assembly established new and distinct standards for evaluating a request for a customer surcharge pursuant to the STRIDE law. Specifically, the STRIDE surcharge is designed "to recover *reasonable and prudent costs* of proposed eligible infrastructure replacement projects." PUA § 4-210(d)(1)(ii) (emphasis added). The "investments and estimated costs" recovered through the surcharge must be: "(i) *reasonable and prudent*; and (ii) designed to improve public safety or infrastructure reliability over the short term and long term." PUA § 4-210(e)(3) (emphasis added). Section 4-210 does not guarantee the gas company a reasonable return on the fair value of assets used and useful in providing service, as in the traditional rate-of-return model; instead, it merely permits the gas company, between base rate cases, to recover certain "reasonable and prudent" costs through surcharges that do not exceed a statutory maximum. The adjustments to scrutinize the replaced infrastructure under a traditional rate analysis do not occur until a post-approval rate case. *See* PUA § 4-210(d)(5)-(6); PUA § 4-210(g); PUA § 4-210(i).

The STRIDE law is not the first instance in which the General Assembly has established a rate mechanism procedurally and substantively distinct from conventional ratemaking. In *Office of People's Counsel v. Maryland Pub. Serv. Comm'n*, 355 Md. 1 (1999), the Court of Appeals rejected the notion that rates set outside the traditional regulatory scheme must strictly satisfy the statutory criteria for "just and reasonable rates." In 1995, the General Assembly had enacted legislation authorizing an alternative

method for setting telecommunications rates, to permit greater price flexibility than was provided by the traditional recovery model. *Id.* at 9. The 1995 statute (currently codified at PUA § 4-301) provided that, notwithstanding the statutory definition of just and reasonable rates, the Commission could regulate telephone companies through alternative forms of price regulation to ensure "affordable and reasonably priced" service. Pursuant to that statute, the Commission established telecommunications rates through a price-cap regulatory plan, which it considered to be a "'broader and more forward-looking measure of rate reasonableness'" than the traditional rate-of-return measures. *Office of People's Counsel v. Maryland Pub. Serv. Comm'n*, 355 Md. at 7, 11.

OPC challenged that price regulation, contending that the "affordable and reasonably priced" criterion of the new statute was in addition to, rather than a substitute for, the definition of "just and reasonable rates." *Id.* at 20-21. Rejecting that view, the Court focused upon the statutory definition of "just and reasonable rates," which included the requirement that rates "'will result in an operating income to the public service company . . . yielding . . . a reasonable return upon the fair value of the company's property used and useful in rendering service to the public.'" *Id.* at 8-9 (quoting former art. 78, § 69(a)). The Court reasoned that this defined term "requires a traditional rate analysis to be made from a specified comparison of costs, rates[,] and profits[.]" *Id.* at 23. Those enumerated criteria for evaluating justness and reasonableness do not apply when the Commission regulates a utility by means of an alternative mode of regulation that does not use a traditional rate-of-return methodology. *Id.* at 23-24. The new statute's guarantee of "'affordable and reasonably priced'" service acted as the

"equivalent" of the general mandate that a utility charge "'just and reasonable rates.'" *Id.* at 24.

Similarly, in *Severstal Sparrows Point, LLC v. Pub. Serv. Comm'n of Maryland*, 194 Md. App. 601, 620 (2010), this Court concluded that the definition of a "just and reasonable rate" in PUA § 4-101 did not apply to another form of regulation "outside the realm of traditional rate-of-return ratemaking." In that case, this Court construed a 1999 statute that obligated electricity suppliers to offer certain customers "'backstop' electricity supply, known as Standard Offer Service[.]" *Id.* at 605. The statute required the service to be offered "at a market price that permits recovery of the verifiable, prudently incurred costs to procure or produce the electricity plus a reasonable return." PUA § 7-510(c)(3)(ii)(2). In addition, the statute gave the Commission limited oversight to ensure that the price was procured "in a manner that is designed to obtain the best price for residential and small commercial customers[.]" PUA § 7-510(c)(4)(ii)(1). Ultimately, this Court concluded that the Commission erred when it attempted to graft elements of a traditional rate case onto this more abbreviated oversight process, controlled by statutory criteria other than section 4-101. *Severstal Sparrows Point*, 194 Md. App. at 622-26.

Consistent with these authorities, we conclude that the Commission is not required to evaluate the justness and reasonableness of a customer surcharge under the 2013 STRIDE law based strictly on criteria that are associated with the traditional base rate recovery models. Section 4-210 authorizes a surcharge "outside the traditional ratemaking process." *Severstal Sparrows Point*, 194 Md. App. at 619 (citing *Office of*

-31-

*People's Counsel v. Maryland Pub. Serv. Comm'n*, 355 Md. at 23).  The Code

undoubtedly mandates that BGE charge "just and reasonable" rates for its gas service.

*See* PUA § 4-201; *Office of People's Counsel v. Maryland Pub. Serv. Comm'n*, 355 Md.

at 25.  Yet, in this context, the requirements that costs recovered through the surcharge be

reasonable, prudent, and otherwise in accordance with section 4-210 serve as the

"equivalent" of that standard.  *Office of People's Counsel v. Maryland Pub. Serv.*

*Comm'n*, 355 Md. at 24.  The Commission here correctly declined OPC's invitation to

overwrite the STRIDE methodology with elements of the traditional rate-of-return

methodology where neither the statutory language, nor the statutory scheme, nor logic

compels the application of those principles here.[9]

### D.    Confirmation Through Other Indicia of Legislative Intent

Even if we agreed that this statute were reasonably susceptible to the alternative

---

[9] BGE argues that the "used and useful" component of the "just and reasonable rate" definition does not prohibit the Commission from authorizing concurrent surcharges before assets are placed in service.  BGE points out that "[t]he meaning and the concept of the words 'used and useful in rendering service to the public' have been held to have a certain elasticity since the phrase first came into use."  *Baltimore Gas & Elec. Co. v. McQuaid*, 220 Md. 373, 379 (1959).  Thus, even in an ordinary rate case, the rate-setting body might be able to consider certain assets that, although not currently in use, are "likely to be placed in service within the period for which the rates are fixed."  *Id.* at 380. According to BGE, the surcharges approved by the Commission comport with PUA § 4-101(3) because there is "some measure of certainty" that the assets not currently in use "will in fact be coming into use shortly[.]"  *Bldg. Owners & Managers Ass'n of Metro. Baltimore, Inc. v. Pub. Serv. Comm'n of Maryland*, 93 Md. App. 741, 770-71 (1992).  As a result of our holding that PUA § 4-210 authorizes a surcharge separate from the ordinary rate setting process, it is unnecessary to decide the extent to which the Commission, pursuant to its ordinary ratemaking powers, may approve contemporaneous surcharges based on cost projections.

interpretation offered by OPC, our next task would be to consult "other indicia of legislative intent . . . , including the relevant statute's legislative history, the context of the statute within the broader legislative scheme, and the relative rationality of competing constructions." *Harrison-Solomon v. State*, 442 Md. 254, 265-66 (2015) (citing *Witte v. Azarian*, 369 Md. 518, 525-26 (2002)). OPC's reading finds no support in these sources.

The Commission's construction is faithful to the express "purpose and intent" of the General Assembly, which was "to *accelerate* gas infrastructure improvements . . . by establishing a mechanism for gas companies to *promptly* recover reasonable and prudent costs . . . *separate* from base rate proceedings." PUA § 4-210(b) (emphasis added). OPC's construction of the statute would do little to accomplish the General Assembly's stated aims. In contrast to OPC's, the Commission's interpretation represents a more reasonable method of accelerating a gas system overhaul because it allows substantially more prompt cost recovery than previously available under base rate proceedings.

Although there is little need to look beyond the pages of the Maryland Code to ascertain the meaning of this provision, other materials associated with this statute's legislative history confirm the Commission's interpretation.[10] A summary of the law prepared by the Department of Legislative Services states: "The estimated project costs approved in the surcharge are collectible during the same time the eligible infrastructure

---

[10] Even where the words of a statute make its meaning clear, courts may consider legislative history and other external manifestations of legislative intent to confirm the correctness of the interpretation. *See, e.g.*, *Guttman v. Wells Fargo Bank*, 421 Md. 227, 239-40 (2011).

replacement is being made." Fiscal and Policy Note for S.B. 8 (2013 Reg. Sess.), at 2. The report goes on to assess the probable effect of the legislation on ratepayers, operating under that assumption: "[T]here is a mismatch between the recovery of infrastructure costs and the benefits from the infrastructure investment. As a result, it could be said that the risk of recovery for the company is reduced – *i.e.* shifted to ratepayers by virtue of the fact that ratepayers pay for the costs earlier." *Id.* at 8. Because the Court of Appeals has often treated similar materials as persuasive evidence of the apparent intent of the General Assembly (*e.g. Gomez v. Jackson Hewitt, Inc.*, 427 Md. 128, 177-78 (2012); *Moore v. State*, 388 Md. 623, 635-36 & n.4 (2005)), it would also be appropriate to do so here.

In addition to its "plain language" arguments, OPC rounds out its brief with some criticisms of the policy of allowing utilities to begin recovering costs before assets have been placed in service. OPC and other interested parties presented these and other concerns to members of the General Assembly at a hearing of the Senate Finance Committee on January 7, 2013.[11] In our view, OPC's policy criticisms should be directed to the General Assembly, not to the Maryland courts.

The essence of OPC's argument is that, by enacting these words – "the estimated project costs . . . are collectible at the same time the eligible infrastructure replacement is made" – the General Assembly prohibited gas companies from recovering estimated

---

[11] An audio recording of the hearing can be accessed through a link at http://mgaleg.maryland.gov/webmga/frmMain.aspx?id=sb0008&stab=01&pid=billpage&tab=subject3&ys=2013rs (last visited Dec. 7, 2015).

costs until after each project has been completed. Although OPC argues that that is "plain" to OPC, it was not plain to the Department of Legislative Services, or to the parties who protested to the General Assembly that the legislation would enable gas companies to begin charging customers before benefits accrued to those customers. Even Dr. Pavlovic, OPC's expert witness before the Commission, did not contend that the statute "plainly" or unambiguously dictates OPC's preferred result.

The statute neither says nor means that "costs may *not* be collected from residential ratepayers in the STRIDE surcharge until (and unless) each STRIDE project . . . has been 'made,' or completed[.]" Properly construed, "[t]he statute authorizes contemporaneous cost recovery at the time eligible infrastructure replacement work is being performed." The Commission did not err.

## II.

As its first issue in this appeal, OPC challenged the correctness of an interpretation of the statute expressed in the Commission's opinion. OPC's second asserted grounds are nowhere near as clearly defined as the first. Throughout its brief and reply brief, OPC variously accuses the Commission of "act[ing] unlawfully," "exceed[ing] its statutory authority," "refus[ing] to follow clear statutory mandates," ignoring "procedural requirements," making an "improper reading of the law," erring in "how it applied [its] interpretations to the facts," and making a decision based on information that was "not in the evidentiary record[.]"

In considering these arguments, we are again guided by the standard of judicial review, under which "Commission decisions are presumptively correct" (*People's*

*Counsel v. Pub. Serv. Comm'n*, 52 Md. App. at 722), and the petitioner bears the burden to "clearly show[]" the Commission's decision to be unconstitutional, outside statutory authority, made on unlawful procedure, arbitrary or capricious, affected by legal error, or unsupported by substantial evidence. PUA § 3-203. To some extent, OPC's challenge concerns whether the Commission exceeded the regulatory powers vested in it by the General Assembly, powers which are "truly awesome[.]" *Baltimore Gas & Elec. Co. v. Pub. Serv. Comm'n of Maryland*, 75 Md. App. 87, 99 (1988). The Commission not only has powers "specifically conferred by law" but also "the implied and incidental powers needed or proper to carry out its functions," and those powers must be "construed liberally." PUA § 2-112.

OPC's characterization of this alleged error varies, but OPC does advance one unifying theme. According to OPC, "the Commission erred when it failed to follow the express language in PUA § 4-210(d)(1)(i) and (e)(3) by authorizing BGE to begin recovering estimated costs for an eligible infrastructure replacement even though it determined the plan had no 'projects.'" OPC relies on subparagraph 4-210(d)(1)(i), which authorizes a gas company to file "a plan to invest in *eligible infrastructure replacement projects*[.]" (Emphasis added.) OPC also points to paragraph (e)(3), which authorizes the Commission to approve a plan based on findings about "the investments and estimated costs of *eligible infrastructure replacement projects*[.]" (Emphasis added.) OPC argues that the STRIDE law "requires the Commission to review 'projects' prior to approving a 'plan.'" The Commission, by contrast, granted a preliminary approval of

BGE's broader program, conditioned on subsequent annual reviews of those projects.[12]

Although subparagraph (a)(3) enumerates criteria for evaluating whether a project is an "eligible infrastructure replacement project," the statute does not describe what constitutes a "project." Instead, the definitions subsection states: "'Project' means an eligible infrastructure replacement project proposed by a gas company in a plan filed under this section." PUA § 4-210(a)(5). The statute defines a "[p]lan" within section 4-210 to mean "a plan that a gas company files under subsection (d) of this section." PUA § 4-210(a)(4). By using these vague and self-referential definitions for "project" and "plan," the General Assembly indicated that it "intended to entrust the formulation of specific standards to the technical expertise" of the Commission. *Baltimore Gas & Elec. Co. v. Pub. Serv. Comm'n of Maryland*, 305 Md. at 159. This contested proceeding presented the Commission with its first opportunity to articulate those standards.

In its opinion, the Commission expanded upon the meaning of the term "project."

---

[12] In its brief, BGE has argued that this Court should not reach the merits of the second question on appeal. BGE contends that any issues related to approval of the 2014 project list are now moot because the Commission failed to take a second "appeal" after the Commission issued the March 26, 2014, letter order. This argument is misplaced. Order No. 86147, which expressly contemplated further proceedings before the ultimate approval of the surcharge, "was at least arguably not a final reviewable order without the implementing Letter Order." *Mid-Atlantic Power Supply Ass'n v. Maryland Pub. Serv. Comm'n*, 143 Md. App. 419, 458 (2002). The arguably premature filing of OPC's petition, however, did not limit the circuit court's jurisdiction. Because a petition for judicial review is not an "appeal" but an original action, the time requirements for filing a petition for judicial review are not jurisdictional. *Kim v. Comptroller of Treasury*, 350 Md. 527, 535 (1998). Consequently, the circuit court had the power to grant appropriate relief from both orders, even if the January 29 order was not a final order for the purpose of judicial review, because the Commission issued the letter order before any proceedings took place in the circuit court. *See id.* at 534-36; *see also ABF Freight Sys., Inc. v. Gilchrist*, 125 Md. App. 419, 424-26 (1999).

BGE had taken the position that each "asset class" qualified as a single "project." Operating on that assumption, BGE submitted time lines ranging from three years to 30 years for the replacement of the different asset classes, while providing total cost estimates for each the initial five years of implementation. The Commission concluded that these general estimates were inadequate, explaining that "the term 'project' in [s]ection 4-210(d)(2) means something more specific, concrete[,] and practical than a broadly outlined plan." Put differently, the Commission concluded that BGE had provided information for five *categories* of projects, without identifying the individual projects within those categories.

The Commission "agree[d] with OPC in its interpretation" that the gas company must submit project costs and time lines for each project so that the Commission could "establish the reasonableness and prudence of the projects." The Commission declared that "BGE must meet the statutory requirements to provide the costs and timeline for completion of each project <u>before</u> surcharge recovery may commence." Thus, contrary to OPC's assertion on appeal, the Commission did not authorize "BGE to begin recovering estimated costs . . . even though it determined the plan had no 'projects.'" In fact, the Commission did the opposite. The immediate effect of Order No. 86147 was to prohibit BGE from imposing the surcharge as of January 29, 2014, subject to later review of a list of 2014 projects.[13]

---

[13] If the Commission had failed to take action on January 29, 2014, the last day of the 180-day statutory review period, BGE would have been authorized to implement the plan even without an approval. *See* PUA § 4-210(f)(1).

OPC takes no issue with the Commission's conclusions about the level of specificity required for the "projects" included with a gas company's plan, and OPC agrees with the conclusion that review of a project list, along with estimated costs and time lines, was necessary before authorizing the surcharge. Moreover, OPC has not disputed that BGE complied with the Commission's conditions when it submitted the necessary project list on February 21, 2014, which the Commission subsequently reviewed and approved at the administrative meeting on March 26, 2014. For that reason, by the time that the Commission actually authorized BGE to begin collecting the customer surcharge, the substantive basis for OPC's objections no longer existed: BGE had identified "projects" for 2014, and the Commission had reviewed the reasonableness and prudence of those projects as required by the statute. The same characteristic of Order No. 86147 to which OPC objects – the Commission's multi-step process for reviewing the plan – was precisely the feature that ensured that the ultimate decision would comport with the statute.

OPC protests, however, that by inviting BGE to make "after-the-fact changes to its plan," the Commission "prevent[ed] full review prior to approval of the plan[.]" OPC theorizes that "the project modifications and surcharge changes" from BGE's filing on February 21, 2014, "amounted to amendments that should have been treated under the 120-day schedule provided for in paragraph (e)(2)." Yet assuming that the Commission should have treated BGE's updated project list as an amendment, the Commission was not necessarily required to wait any particular period of time or to conduct a full hearing before acting on those amendments. The statute sets a 120-day maximum period for

considering an amendment, not a 120-day minimum. *See* PUA § 4-210(e)(2) ("Within 120 days after a gas company files an amendment to an approved plan, the Commission shall take final action to approve or deny the amendment"). The statute includes no specific requirement of a hearing on an amendment to a plan. In general, the Public Utilities law directs the Commission to "institute and conduct proceedings reasonably necessary and proper to the exercise of its powers or the performance of its duties." PUA § 3-104(a)(1).

As illustrated by this Court's opinion in *Building Owners and Managers Ass'n of Metropolitan Baltimore, Inc. v. Pub. Serv. Comm'n of Maryland*, 93 Md. App. 741, 764-72 (1992) ("*BOMA*"), the Public Service Commission has considerable discretion in deciding whether to require separate proceedings for reviewing different elements of a rate request. In *BOMA*, at the conclusion of a conventional rate case, the Commission had authorized a "two-step increase" in BGE's electricity rates, granting an immediate rate increase and also authorizing BGE to file an amended rate schedule several months later when a new plant was expected to begin operation. *Id.* at 746. The Commission directed the company to file revised tariff schedules, along with data necessary for the Commission to verify the reasonableness of the second rate increase. *Id.* at 766-77. The Commission determined that it was unnecessary and against the public interest to require a separate and expensive proceeding that would only repeat much of the presentation from the first hearing. *Id.* at 766. For that reason, the Commission accepted the final submissions as a compliance filing for an administrative meeting, giving the parties the opportunity to express their views without formal testimony. *Id.* at 767.

On appeal in *BOMA*, OPC contended that the Commission had acted arbitrarily, acted without substantial evidence, and deprived ratepayers of due process when it approved the second rate increase without a new proceeding and a full hearing. *Id.* at 768-69. This Court rejected those arguments, holding that the Commission did not abuse its discretion or act unlawfully by refusing to require an entirely new, and largely duplicative, rate case. *Id.* at 771-72. In light of the reasoning of *BOMA*, there is nothing inherently objectionable about the type of multi-step procedure used here by the Commission.

After a contested hearing in this case, the Commission had already determined, based on BGE's initial submissions, that projects to replace assets in the categories targeted by BGE would qualify as eligible infrastructure replacement projects and would improve public safety and infrastructure reliability. The Commission required more information to reach a conclusion as to whether "each proposed project [wa]s reasonable and prudent both from an infrastructure and cost standpoint," in accordance with PUA § 4-210(e)(3). Having already reviewed the company's overarching program, the Commission decided to make those remaining determinations through a series of abbreviated proceedings, first by reviewing the projects and estimated costs for 2014, followed by review of annual filings in each of the subsequent four years.

OPC argues that, under these circumstances, such a "conditional approval" was unlawful, and that the Commission's only option was to deny BGE's application. In essence, OPC asks this Court to invalidate the Commission's approval of the 2014 projects and surcharge and to send all parties back to the beginning of the process. OPC

-41-

concludes: "if BGE wishes to proceed again under § 4-210 for recovery of these costs, the parties should be provided an opportunity to determine what, if any, of BGE's projects meet the statutory requirements, and then, and only then, may the Commission determine if it wishes to approve a plan and whether a surcharge crafted in accordance with § 4-210 may be imposed upon customers."

The Commission has already provided that relief ("an opportunity to determine what, if any, of BGE's projects meet the statutory requirements") through its multi-step approval. The process devised by the Commission eliminated unnecessary delay, while also ensuring that ratepayers would not pay surcharges in 2014 and in subsequent years until after the Commission had determined that the proposed projects and estimated costs were reasonable and prudent. We see no unlawfulness or abuse of discretion in the Commission's informed decision to invite BGE to amend its proposals and to review those amendments at an informal administrative meeting, rather than to require an entirely new proceeding.

<u>CONCLUSION</u>

For the reasons stated in this opinion, we affirm the judgment of the circuit court, which affirmed the decision of the Public Service Commission. OPC has not clearly shown that the Commission based its decision on an error of law or that the decision was otherwise unlawful.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**