*In the Matter of SmartEnergy Holdings, LLC*, No. 1675, September Term, 2021. Opinion by Ripken, J.

**CONSUMER PROTECTION DIVISION – MARYLAND TELEPHONE SOLICITATIONS ACT – ENFORCEMENT**

The MTSA is a subtitle of the Consumer Protection Article. Maryland electricity suppliers are subject to consumer protection laws. The Public Service Commission has jurisdiction to determine whether electricity suppliers violate the MTSA.

**CONSUMER PROTECTION DIVISION – MARYLAND TELEPHONE SOLICITATIONS ACT – IN GENERAL**

The MTSA defines telephone solicitation in terms of two separate requirements: The attempt by a merchant to sell goods or services to a consumer that is: (1) Made entirely by telephone; and (2) Initiated by the merchant. CL § 14-2201(f). Initiation by the merchant is not limited to telephone communication and could include initiation by mailing postcards to consumers.

**CONSUMER PROTECTION DIVISION – MARYLAND TELEPHONE SOLICITATIONS ACT – PENALTIES**

The Public Service Commission has jurisdiction to impose civil penalties against a utility company that violates the MTSA.

Circuit Court for Montgomery County
Case No. 485338V

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 1675

September Term, 2021

_____

In the Matter of SmartEnergy Holdings, LLC

_____

Zic,
Ripken,
Raker, Irma S.
        (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Ripken, J.
_____

Filed: December 22, 2022

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

*Leahy, Andrea, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.
**Albright, Anne, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

Following the receipt of numerous customer complaints by the Public Service Commission ("Commission"), a complaint was filed against SmartEnergy Holdings, LLC ("SmartEnergy") contending that it systematically violated consumer protection laws. The complaint alleged, among other charges, that SmartEnergy sent misleading and deceptive mailing materials to customers wherein phone calls were solicited, that it utilized a misleading sales script over the phone, that it failed to monitor its agents' phone calls, and that SmartEnergy enrolled customers without reducing the agreement to a written contract signed by the customer.

Following an evidentiary hearing, a Public Utility Law Judge ("PULJ") proposed an order to the Commission finding that SmartEnergy engaged in unfair, false, misleading, and deceptive marketing, advertisement, and trade practices. SmartEnergy appealed that proposed order, and the Commission affirmed the PULJ's findings of violations, in addition to finding that the Maryland Telephone Solicitations Act ("MTSA") was applicable. The Commission ordered SmartEnergy to refund all of its Maryland retail supply customers, that were enrolled during the violation time period, the difference between the rates charged by SmartEnergy and the applicable utility Standard Offer Service rate. SmartEnergy petitioned for judicial review in the Circuit Court for Montgomery County. That court affirmed the Commission's findings. SmartEnergy now appeals to this Court. For the reasons that follow, we shall affirm.

# ISSUES PRESENTED

SmartEnergy presents six questions for our review, which we have condensed and rephrased as follows:[1]

    I.      Did the Commission have jurisdiction to levy penalties for violations of the MTSA?

    II.     Did the Commission err in finding that the MSTA applied and that SmartEnergy did not otherwise satisfy an exemption?

    III.    Was the penalty for those violations of the MTSA arbitrary and capricious?

For the reasons to follow, we hold that the Commission had jurisdiction to levy penalties for MTSA violations, the MTSA applied to SmartEnergy's conduct and there was

---

[1] Rephrased from:
1. Does the Commission have jurisdiction to levy penalties arising from alleged violations of the MTSA, Md. Code, Com. Law, § 14-2201 et seq.?
2. Did the Commission err in concluding that the MTSA, Md. Code, Com. Law, § 14-2201 et seq. applies to SmartEnergy's conduct when SmartEnergy's enrollments were not "telephone solicitations" as that term is defined in Md. Code, Com. Law, § 14-2201(f)?
   a. If the MTSA does apply, did SmartEnergy satisfy the exemption in Md. Code, Com. Law, § 14-2202(a)(5) in which the consumer contracted with SmartEnergy "pursuant to an examination of a . . . print advertisement or a sample, brochure, catalogue, or other mailing material of" SmartEnergy that contained information listed in that Code Section?
   b. If the MTSA does apply, did SmartEnergy satisfy the exemption in Md. Code, Com. Law, § 14-2202(a)(2) (Comm. Law Art.) in which SmartEnergy "[h]as a preexisting business relationship with the consumer"?
3. Did the Commission act arbitrarily and capriciously in affirming findings of the PULJ regarding SmartEnergy's postcards, sales script, cancellation procedures, training, and monitoring when it affirmed findings unsupported by substantial evidence in the record?
4. Did the Commission act arbitrarily and capriciously, and therefore violate SmartEnergy's due process rights, in fashioning a penalty that requires SmartEnergy to, among other things, pay millions of dollars in "re-rates" to its current and former Maryland customers?

2

substantial evidence to support the Commission's findings of violations. Finally, we hold the Commission's penalty was not arbitrary and capricious

## FACTUAL AND PROCEDURAL BACKGROUND

SmartEnergy is a retail supplier selling energy to consumers in Maryland. From February 2017–May 2019, SmartEnergy mailed six million postcards to Marylanders advertising their services. Those postcards informed consumers that they were "eligible" for a "free month of electricity" and a six-month guaranteed rate protection plan. They further indicated that the eligibility for the free month was linked to the customers' status with their then-current electricity utility: "As a [utility] customer from [city], you are eligible to receive one free month of electricity." The postcards stated that the offer was "time-sensitive," so customers should "respond by [date]" to receive the offer. In small print at the bottom of the postcard, customers were informed that to receive the free month of electricity, the customer must "select SmartEnergy," that SmartEnergy was not affiliated with the then-current utility but is a licensed supplier, and a license number was provided.

During this timeframe, SmartEnergy received approximately 104,000 calls from prospective customers who received the postcards. Each call was recorded by SmartEnergy, and SmartEnergy telephone operators were directed to follow a script. Generally, the phone calls were conducted as follows: First, the representative greeted and informed the customer that the representative was with SmartEnergy and frequently "congratulated" the customer on the free month of energy. The representative stated that, in addition to the free month, the customer also qualified for the price protection plan, wherein the rate would remain the same for six months. The representative further

3

suggested that the fixed rate provided more security compared to utilities' variable rates, particularly during the high usage months. At that point, the representative requested information from the customer including the electric choice ID that appeared on the utility bill and confirmation of the account holder status. The representative then indicated that the representative had "confirmation questions" that the customer was required to answer in order to receive the free month and price protection. Pursuant to the sales script, those questions were:

> Confirmation question #1: [customer], do you understand that by enrolling in SmartEnergy's Price Protection Plan, you'll receive a fixed rate of [rate] for 6 months and then a competitive market based rate that may change from month-to-month, and as mentioned, [Utility] will continue to deliver your electricity, send your bill, and respond to emergencies?
>
> ***
>
> Confirmation question #2: SmartEnergy will send you a Welcome Kit confirming everything we have discussed today, and [Utility] will send you a letter confirming that you have selected SmartEnergy. When you receive the SmartEnergy Welcome Kit, you'll be able to review all the terms of our agreement and if you change your mind you can cancel and return to [Utility] standard rate at any time. Do you understand your right to cancel?

Of the 104,000 prospective callers from February 2017–May 2019, 32,000 callers enrolled in SmartEnergy's service. SmartEnergy did not provide written contracts or contract summaries to those who enrolled.

In some cases,[2] SmartEnergy sent customers a Welcome Kit. That kit contained a letter, which stated:

> Welcome and congratulations for choosing SmartEnergy.

___

[2] Of the 34 complaints filed, SmartEnergy produced copies of the Welcome Kits for only 25.

We want to remind you of the key benefits of your plan, and make sure you understand what to expect. At SmartEnergy we will strive to provide you with the lowest possible rate, cleaner electricity, and the same reliable service.

You have selected our 6 month fixed product with a fixed price of 11.20 cents per kilowatt hour. Your electricity rate will appear on the supply portion of your bill. Your agreement and other materials are enclosed.

Here's what to expect:

> [Utility] will still deliver your electricity, read your meter and respond to emergencies just like they always have. Your choice of SmartEnergy will be processed by [Utility] within one or two billing cycles.

> After that, you will see SmartEnergy listed in the electricity supply portion of your [Utility] bill. You'll continue to receive one bill and make one payment to [Utility] every month. Nothing else will change.

Thereafter, the Commission's Consumer Assistance Division received 34 complaints of service regarding SmartEnergy. The basis of those complaints included that the customers' utility switch was done without their authorization, that SmartEnergy portrayed themselves as being affiliated with the customers' then-current provider, that the bills were excessive, and that the customers were unable to cancel their service.[3]

On May 10, 2019, Office of Staff Counsel of the Commission ("Staff") filed an

---

[3] For example, one complaint alleged: "I thought I was speaking to BGE. I wasn't. It was someone from SmartEnergy and not affiliated with BGE." Another indicated: "I was contacted by Smart Energy portraying themselves as subsidiary of BGE[.]" Others stated: "I called [] to cancel this offer. I was put on hold for 11 minutes and instructed to leave a message and my call would be returned asap." "Customer agreed to service but called next day to cancel. However company wouldn't cancel. Customer says company said she didn't have a good reason to cancel." Many customers noted in their complaints that their prior utility company advised them to contact the Consumer Assistance Division because "it sounded as if it was a scam," and to "prevent future misinformation being distributed by SmartEnergy."

initial complaint against SmartEnergy, asserting SmartEnergy violated Maryland law governing retail supplier activities by engaging in deceptive practices. The Commission delegated the complaint to a PULJ to determine whether a pattern or practice of violations of consumer protections existed. Staff filed an amended complaint in July 2019, as well as a second amended complaint in September 2019. The Maryland Office of People's Counsel ("OPC") also filed a third-party complaint against SmartEnergy asserting it violated consumer protection laws in engaging in fraud and deceptive practices.

In January 2020, OPC filed the testimony of Susan Baldwin ("Baldwin") and Harold Muncy ("Muncy"). Baldwin, a specialist in economics, regulation, and public policy of utilities, testified regarding the consumer issues related to SmartEnergy's electric supply. Baldwin reviewed all the filings and supporting exhibits, as well as the relevant Maryland laws and regulations. In reviewing the postcards sent to consumers and audio recordings of the phone calls between SmartEnergy sales representatives and those customers who filed a complaint, Baldwin opined that SmartEnergy used mail materials and telephone contracts that were misleading, deceptive, and filled with incomplete information. Baldwin further opined that SmartEnergy failed to adequately supervise and train its sales representatives, and that those patterns documented in the complaints received likely extended to the other Maryland enrollments.

Muncy testified regarding what utility electric supply rate information would have been available on the dates the consumers who filed complaints had signed up. He specifically testified as to the comparison between the SmartEnergy rates and other utility rates. Based on this analysis, Muncy opined that there was no lack of certainty with utility

6

rates, and that SmartEnergy's six-month fixed rate program was of no monetary value to any of those customers who filed a complaint.

Staff filed the testimony of Kevin Mosier ("Mosier"). Mosier testified that based on a review of the complaints and associated audio recordings, SmartEnergy engaged in a pattern and practice of systemic violations of Maryland consumer protection laws. Mosier cited the telemarketing calls which contained false implications that customers' rates would not increase, deliberately obscured information that customers would be switching to a competitive supplier, and misled customers into believing that their current supplier rates would increase if they did not switch. He further explained that the deceptions were a "direct result of [SmartEnergy's] 'telephone script' which was required to be used by all sales representatives," and that the script "was crafted to deceive the customer to believe there would be no increase to the existing rate."

SmartEnergy filed the testimony and related exhibits of Daniel Kern ("Kern"), Lloyd Spencer ("Spencer"), Dehan Besnayake ("Besnayake"), and Ann Marie Toss ("Toss"). Besnayake, SmartEnergy's Chief Customer Officer, testified regarding SmartEnergy's quality assurance process and the procedure for addressing cancellation requests. Besnayake stated that the process was robust and done daily, and agents who failed the monitoring process were required to go through a retraining program. He indicated that SmartEnergy transitioned to a "more formalized and standardized approach" in 2019, placing "special emphasis on the quality of communications with consumers." As for cancellation requests, Kern, SmartEnergy's Chief Executive Officer, stated that the agent would ask for the cancellation reason and attempt to retain the customer but go

7

forward with processing the cancellation if unable to retain the customer. He stated that all cancellation requests cited by the Commission were in fact timely processed.

Toss testified that, in her experience as Chief Compliance Officer, SmartEnergy complied with Maryland consumer protection laws. Toss described the process for handling complaints that originated in the Commission, including launching an investigation to determine whether a violation occurred. Toss further testified that SmartEnergy took steps to ensure compliance with Maryland laws, including, beginning in June 2019, by sending contract summaries, and, prior to June 2019, by sending explanatory letters to enrolled customers explaining that SmartEnergy is an independent supplier.

Spencer testified as the Chief Operating Officer of SmartEnergy. In response to Muncy's testimony, Spencer opined that Muncy was incorrect in stating that SmartEnergy called the consumer, where the calls in fact were inbound. He also cited a portion of Muncy's testimony wherein Muncy noted that SmartEnergy knew published utility rates and misstated their own rate as lower. Spencer pointed out that the customer may also have been aware of published utility rates because they appeared on bills. Finally, Spencer opined that Muncy was incorrect in stating that, because of only small rate adjustment fluctuations, the term "price protection" was misleading. He further indicated that Muncy's testimony that SmartEnergy prices were typically higher than standard utility rates was erroneous. He stated that the two cannot be compared because the standard utility rate fluctuated and did not offer a free month, so "there [were] incentives and value-added components of SmartEnergy's offer that [were] not available" with standard utility companies.

Kerntestified that SmartEnergy did not engage in deceptive or misleading sales and marketing practices, and that it complied with Maryland law and regulations governing energy retail suppliers. Kern testified that SmartEnergy did not engage in outbound telephone sales; it "only receive[d] calls from potential customers." Kern further opined that to require SmartEnergy to have obtained a written contract signed by the customer was not consistent with the language of the Maryland Telephone Solicitations Act and COMAR provisions as enrollments were done in response to customer calls and not through outbound telephone solicitation. Kern also disputed the contention that the postcards were misleading, arguing that all the required information for a general marketing advertisement was included on the postcards, and that there was no rule regarding particular postcard formatting. Additionally, Kern testified that SmartEnergy disclosed all agreements' material information and has had relatively few complaints. Kern disagreed that SmartEnergy engaged in a "systemic practice" of deception and misrepresentation.

An evidentiary hearing was held before the PULJ on October 28 and 29, 2020. On December 16, 2020, the PULJ issued a proposed order.[4] That order proposed finding that SmartEnergy engaged in systemic violations of PUA § 7-505(b)(7) and associated COMAR provisions by engaging in unfair, false, misleading, and deceptive marketing,

---

[4] Pursuant to PUA § 3-104(d)(1), the Commission can delegate to a PULJ "the authority to conduct a proceeding that is within the Commission's jurisdiction." Then, the PULJ issues a proposed order and findings of fact. PUA § 3-104(d)(2). Each party has 30 days to note an appeal with the Commission, and one is noted, the Commission shall consider the matter, conduct any further proceedings, and issue a final order. PUA § 3-113(d). If no timely appeal is made to the PULJ's proposed order, that proposed order becomes the final order of the Commission. PUA § 3-113(d).

advertisement, and trade practices. The PULJ found that the MTSA, which applies to telephone solicitations that are both initiated by the merchant and done entirely by telephone, does not apply to SmartEnergy's contracting with customers because the customers initiated the phone call. However, the PULJ also found that the enrollments were nonetheless invalid because SmartEnergy did not comply with COMAR 20.53.07.08. Based on these violations, the PULJ recommended that the Commission impose a moratorium prohibiting SmartEnergy from adding or soliciting new customers, impose a civil penalty, and require SmartEnergy to notify the current and former customers of the Commission's decision. The PULJ also recommended that SmartEnergy be required to cancel existing customer enrollments, return those customers to utility Standard Offer Service, and issue refunds for the difference in service rates each month. On December 22, 2020, the Commission entered an Order prohibiting SmartEnergy from soliciting new customers. That Order also directed the parties as to how to file exceptions to the PULJ's Proposed Order.

SmartEnergy filed a notice of appeal of the Proposed Order on January 15, 2021, and its memorandum of appeal on January 25, 2021. SmartEnergy argued that multiple findings in the Proposed Order were arbitrary, capricious, and not supported by the evidence. It further argued that the remedy was unconstitutional and unduly penalizing. OPC and Staff also filed exceptions to the Proposed Order on January 25, 2021.[5]

---

[5] The Office of the Attorney General of Maryland, Consumer Protection Division, filed an Amicus Memorandum of Law in support of the exceptions of Staff and OPC. In that brief, it argued that the PULJ's holding that MTSA did not apply irreconcilably conflicts with

On March 31, 2021, the Commission entered an Order affirming the PULJ's findings that SmartEnergy violated PUA § 7-507(b)(7) and COMAR Title 20, Subsection 53 provisions. It reversed the PULJ's finding that the MTSA did not apply to calls initiated by prospective customers. The Commission found that the plain language of the MTSA does not differentiate between inbound and outbound calls, and such a distinction "conflates the 'initiation' of the telephone call and the initiation of the attempt by the merchant to sell or lease consumer goods." The customer's phone call was in response to SmartEnergy's sending postcards to customers; therefore, the Commission found, SmartEnergy initiated the attempt to sell an energy supply product. Because the sale was initiated by SmartEnergy and made entirely by telephone, the Commission found the MTSA to apply. It rejected SmartEnergy's contentions that exemptions under MTSA applied, and found that, in failing to provide customers with written contracts, SmartEnergy violated the MTSA.

The Commission also found that SmartEnergy engaged in false and misleading advertising to solicit customer calls. Specifically, SmartEnergy sent over six million postcards that advertised a free month of electricity and a six-month price protection plan, but the customer was not informed until the phone call with the sales representative about 1) the terms and conditions of the service, 2) the rate that would be charged during that six-month price protection period, 3) the requirement that the customer remain on the fixed rate plan for the entire six-month period before becoming eligible for the free month, 4)

the plain meaning of the statute, and that the MTSA is applicable to sales wherein the customer calls the merchant.

11

the method for claiming the refund check for the free month, and 5) the customer's right to cancel the service and return to their other utility supplier. The Commission further noted that the postcard's statement that "as a [utility] customer . . . you are eligible to receive one free month of electricity," and sales script phrases such as "yes, I see that as a [utility] customer, you are eligible to receive one free month of electricity" implied that the offer was being made by the customer's then-current utility. Finally, the Commission found that SmartEnergy misled customers in suggesting that the electricity rates in upcoming seasons would likely fluctuate.

The Commission concluded that SmartEnergy: 1) unlawfully enrolled customers; 2) engaged in deceptive trade practices; 3) violated commission regulations; and 4) violated state consumer protection laws. In finding that SmartEnergy failed to comply with MTSA's contracting requirements, in addition to SmartEnergy violating PUA § 7-507(b)(7) and COMAR Title 20, Subsection 53 provisions, the Commission held that the contracts were invalid, and it ordered SmartEnergy to issue partial refunds to all customers enrolled from February 2017–May 2019 and return them to their prior utility service.

SmartEnergy appealed the Commission's findings to the Circuit Court for Montgomery County. It contended that the MTSA did not apply to its actions in sending the postcards and that, alternatively, exemptions to the MTSA applied to its conduct, the Commission's findings were unsupported by substantial evidence, and the penalty levied was arbitrary and capricious. A two-day hearing was held on October 15 and 22, 2021. The circuit court entered an order on December 20, 2021, affirming the Commission's decision. SmartEnergy filed this timely appeal.

**STANDARD OF REVIEW**

"The Public Utilities Article 'sets forth the limited "scope of review" . . . over decisions by the Public Service Commission.'" *Md. Off. of People's Couns. v. Md. Pub. Serv. Comm'n*, 226 Md. App. 483, 499 (2016) (quoting *Town of Easton v. Pub. Serv. Comm'n*, 379 Md. 21, 30 (2003)). "It states: 'Every final decision, order, or regulation [of] the Commission is *prima facie correct* and *shall be affirmed* unless *clearly shown* to be: (1) unconstitutional; (2) outside the statutory authority or jurisdiction of the Commission; (3) made on unlawful procedure; (4) arbitrary or capricious; (5) affected by other error of law; or (6) if the subject of review is an order entered in a contested proceeding after a hearing, unsupported by substantial evidence on the record considered as a whole.'" *Id.* at 499–500 (quoting PUA § 3-203 (emphasis added)).

The Commission is vested with a great deal of discretion in discharging its "important and complex duties." *People's Couns. v. Pub. Serv. Comm'n*, 52 Md. App. 715, 722 (1982). "Because the Commission is well informed by its own expertise and specialized staff, a court reviewing a factual matter will not substitute its own judgment on review of a fairly debatable matter." *Commc'ns Workers of Am. v. Pub. Serv. Comm'n*, 424 Md. 418, 433 (2012). In contrast, an agency's interpretation of a statute that it administers "may be entitled to some deference," but the weight to be accorded to that interpretation depends upon a number of considerations: whether the agency adopted its view soon after the statute's passage, whether the interpretation "has been applied consistently and for a long period of time," "the extent to which the agency engaged in a process of reasoned elaboration in formulating its interpretation," and "the nature and process through which

the agency arrived at its interpretation." *Md. Off. of People's Couns.*, 226 Md. App. at 501 (quotation marks and citations omitted). When the Maryland Public Service Commission has "clearly demonstrated that it has focused its attention on the statutory provisions in question, thoroughly addressed the relevant issues, and reached its interpretations through a sound reasoning process, its interpretation should be accorded the persuasiveness due a well-considered opinion of an expert body." *Id.* at 505 (quotation marks and citations omitted).

## DISCUSSION

Maryland electricity suppliers are subject to consumer protection laws prohibiting unfair and deceptive trade practices, as defined in the Maryland Consumer Protection Act ("CPA"), Comm. Law Art. ("CL") § 13-301. An unfair or deceptive trade practice includes any "false, falsely disparaging, or misleading oral or written statements, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers." CPA § 13-301(1). In addition, the Commission sets forth rules and regulations outlined in the Public Utilities Article ("PUA") § 7-505(b)(7) and the Code of Maryland Regulations ("COMAR") 20.53.07.07A(2), which similarly prohibit an electricity supplier from engaging in "marketing, advertising, or trade practices that are unfair, false, misleading, or deceptive."

Within the CPA is Subtitle 22, titled the Maryland Telephone Solicitations Act, CL § 14-2201–14-2205. The MTSA mandates that "[a] contract made pursuant to a telephone solicitation is not valid and enforceable against a consumer" unless the contract is "reduced

14

to writing and signed by the consumer," and returned to the seller.[6] CL § 14-2203. A "telephone solicitation" is defined as an "attempt by a merchant to sell or lease consumer goods, services, or realty to a consumer . . . that is: (1) Made entirely by telephone; and (2) Initiated by the merchant." CL § 14-2201(f). Failure to comply with the MTSA and the CPA constitutes a deceptive practice.

## I.  THE COMMISSION HAS JURISDICTION TO ENFORCE THE MTSA.

Initially, SmartEnergy argues that the Commission does not have jurisdiction to decide disputes related to the MTSA. It argues that because "violations of regulations relating to 'telephone solicitations' are 'unfair or deceptive trade practices, they are subject to enforcement by the Attorney General's Office.'" Therefore, according to SmartEnergy, because the Commission is independent of the Attorney General's Office, the Commission "lacks jurisdiction over the MTSA." The Commission responds that it has jurisdiction to hear and adjudicate "all supplier-complaint issues, including disputes involving whether the MTSA applies to enrollments solicited by telephone."

Our analysis "begins with the statutory directive that the Commission's decision is '*prima facie correct* and shall be affirmed unless *clearly shown* to be . . . outside the

---

[6] That provision also mandates that the contract "[s]hall comply with all other applicable laws and regulations"; "[s]hall match the description of goods or services as that principally used in the telephone solicitation"; "[s]hall contain the name, address, and telephone number of the seller, the total price of the contract, and a detailed description of the goods or services being sold"; "[s]hall contain, in at least 12 point type, immediately preceding the signature, the following statement: 'You are not obligated to pay any money unless you sign this contract and return it to the seller.';" and, "[m]ay not exclude from its terms any oral or written representations made by the merchant to the consumer in connection with the transaction." CL § 14-2203.

15

statutory authority or jurisdiction of the Commission[.]'" *Accokeek, Mattawoman, Piscataway Creeks Communities Council, Inc. v. Md. Pub. Serv. Comm'n*, 227 Md. App. 265, 293 (2016) (emphasis in original). The Public Utilities Article ("PUA") dictates: "the Commission has jurisdiction over each public service company that engages in or operates a utility business in the State[.]" § 2-112(a)(1). The PUA further vests the Commission with "the powers specifically conferred by law," as well as "the implied and incidental powers needed or proper to carry out its functions[.]" PUA § 2-112(b). Those powers "shall be construed liberally." PUA § 2-112(c).

The Commission also has the power to grant licenses to electricity suppliers. PUA § 7-507(a). The Commission "shall adopt regulations or issue orders" to, among other matters, "protect consumers . . . from anticompetitive and abusive practices" and ensure that customers have "adequate and accurate [] information to enable customers to make informed choices" regarding electricity suppliers. PUA § 7-507(e). Additionally, where there have been violations of consumer protection laws, including "any other applicable consumer protection law of the State," the Commission has the power to revoke or suspend licenses of competitive retail suppliers, impose a civil penalty, or other remedy. PUA § 7-507(k).

The Commission is expressly charged with fashioning remedies for violations of "any" applicable consumer protection law. It, therefore, has jurisdiction over each electricity supplier engaged in business in Maryland, which includes SmartEnergy, to ensure that those suppliers comply with specific consumer protections laws, under which the MTSA falls. Based on these applicable statutes, we hold the Commission has

16

jurisdiction to determine whether an electricity supplier violated the MTSA, a subtitle of the Consumer Protection Article.

## II. THE COMMISSION DID NOT ERR IN FINDING SMARTENERGY VIOLATED THE MTSA.

SmartEnergy next contends that the Commission erred in finding that SmartEnergy violated Maryland provisions regarding contracting requirements as well as Maryland provisions prohibiting deceptive practices. As to the contracting requirements, SmartEnergy argues that the violations were based on the MTSA, and the MTSA is not applicable to its conduct. Alternatively, SmartEnergy argues that, even if the MTSA is applicable, its actions are nonetheless exempt from MTSA requirements because they fall within two exemptions: preexisting business relationship, and purchase of goods pursuant to examination of mailing material. Finally, SmartEnergy contends the Commission's factual findings were not supported by substantial evidence.

The Commission responds that the MTSA is applicable to SmartEnergy's conduct, and that neither exception to the contracting requirements mandated by the MTSA is applicable. It further argues that substantial evidence in the record supports the conclusions that SmartEnergy engaged in systemic violations of Maryland consumer protection laws.

We begin with an examination of whether the MTSA is applicable to the conduct giving rise to this action. After explaining that SmartEnergy's conduct falls within the MTSA's definition of telephone solicitation, we look to whether it is nonetheless exempt from contracting requirements pursuant to either of the two exceptions. Finally, we examine whether substantial evidence in the record supports the Commission's finding that

17

SmartEnergy violated Maryland law in its: (1) failure to meet contracting requirements, (2) misleading and deceptive postcards, (3) misleading and deceptive sales scripts, (4) "thwarting" of customer cancellations, and (5) failure to monitor sales calls.

## A. The MTSA is Applicable to SmartEnergy's Actions.

SmartEnergy maintains that the MTSA is not applicable because its actions do not constitute "telephone solicitations," as neither the "entirely by telephone" prong nor the "initiated by merchant" prong of the MTSA's subtitle 22 are met. According to SmartEnergy, the solicitation began with SmartEnergy mailing postcards to consumers, and therefore the attempt to sell was not "entirely by telephone" as expressly defined in CL § 14-2201. Additionally, because the customer initiated the sales call, SmartEnergy maintains that such inbound calls are not initiated by the merchant as mandated by the statute. The appellees respond that the MTSA does not differentiate between inbound and outbound calls.[7] They argue that the mailing of postcards was an invitation to begin the sales discussion, that prompted the customers to call SmartEnergy, after which the actual sale took place entirely by phone.

"The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature." *Donlon v. Montgomery Cnty. Pub. Schools*, 460 Md. 62, 75 (2018) (quoting *Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 618–

---

[7] The Maryland Office of the Attorney General's Consumer Protection Division, the division tasked with enforcing and administering the Consumer Protection Act, filed an amicus curie brief. It argued that the MTSA includes all merchant-initiated telephonic sales attempts, including where consumers call a merchant in response to a merchant's marketing through other means.

19 (2010)). Our primary goal is to "discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny." *Id.* at 75–76. "When interpreting a provision of the Public Utilities Article, as with any other statute, we first examine the ordinary meaning of the enacted language[.]" *Md. Off. of People's Couns.*, 226 Md. App. at 505. "If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written[.]" *Donlon*, 460 Md. at 76.

However, we do not read the statutory language in a vacuum, "nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone." *Id.* Rather, we look "to the larger context, including other surrounding provisions and the apparent purpose of the enactment." *Md. Off. of People's Couns.*, 226 Md. App. at 509. Put differently, "the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Donlon,* 460 Md. at 76. To the extent possible, we read statutes "so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Id.* at 77 (quoting *Bd. of Ed. of Garrett Cnty. v. Lendo*, 295 Md. 55, 63 (1982)).

The General Assembly expressed concerns with consumer protection, specifically the "increase of deceptive practices in connection with sales[.]" CL § 13-102(a). The express purpose of the General Assembly in enacting the Consumer Protection Act was to "set certain minimum statewide standards for the protection of consumers across the State" and "take strong protective and preventative steps to investigate unlawful consumer

19

practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland." CL § 13-102(b).

In 1988, in response to requests from the Montgomery County Office of Consumer Affairs, the Office of the Attorney General, and various business groups within the state, the General Assembly recognized that telephone solicitations are particularly susceptible to deceptive practices because they are not reduced to writing. Subsequently, House Bill 1019—the Maryland Telephone Solicitation Act—was introduced into the General Assembly. The Purpose Paragraph of the Act states:

> FOR the purpose of requiring that certain contracts solicited by telephone be reduced to writing in order to be enforceable; prohibiting certain actions by merchants regarding telephone solicitation; requiring that a contract made pursuant to a telephone solicitation meet certain conditions; providing that a violation of this Act shall be an unfair and deceptive trade practice; providing for the applicability of this Act; defining certain terms; and generally relating to telephone solicitation sales.[8] H.B. 1019.

In summarizing the reasons for enacting the MTSA, the House Economic Matters Committee Floor Report[9] explained:

> Telephone solicitations are, by nature, subject to certain problems. The goods are not available for inspection and the identity of the seller is often unclear. Even a faithful description of the contract terms is difficult when done entirely by phone. As a consequence, there have been continuous problems associated with telephone solicitations in this State. Frequently, the product

---

[8] Senate Bill 409, "Telephone Solicitation Sales," which is identical to House Bill 1019, was also introduced in the 1988 legislative session of the Maryland General Assembly.

[9] In analyzing a statute, Floor Reports often serve as "key legislative history documents." *Hayden v. Md. Dep't of Nat. Res.,* 242 Md. App. 505, 530 (2019) (quoting *Blackstone v. Sharma*, 461 Md. 87 (2018); *see also* Jack Schwartz & Amanda Stakem Conn, The Court of Appeals at the Cocktail Party: The Use and Misuse of Legislative History, 54 Md. L. Rev. 432 (1995) (identifying floor reports and fiscal notes as potentially valuable sources of legislative purpose).

or service that the consumer actually receives differs greatly from the solicitor's description of the product or service.

Floor Report, H.B. 1019 at 2.

The legislative history indicates that the MTSA's drafters recognized the need to address the prevailing problems consumers were experiencing with telephone solicitors using deceptive and misleading sales pitches, as well as the lack of verification of contract terms. The General Assembly sought to address these problems specifically through the introduction of the MTSA, which requires a written contract for every seller-initiated phone sale. The MTSA directly furthers the CPA's purpose in consumer protection.

Keeping these concepts in mind, we turn to the plain language of the MTSA. It provides that a telephone solicitation is an attempt by a merchant to sell goods or services to a consumer that is "(1) Made entirely by telephone; *and* (2) Initiated by the merchant." CL § 14-2201(f) (emphasis added). The statute is comprised of two separate requirements; the sale must be made entirely by telephone, and it must have been initiated, in some manner, by the merchant. Had the legislature intended for the MTSA to apply only to sales the merchant initiates by telephone, it could have expressly indicated as much without writing the statute as conjunctive. Instead, the statute, by its plain language, requires two distinct elements to have taken place, only one of which specifies the requirement that it be by telephone. That language indicates that the initiation by the merchant is not limited to telephone.

Such an interpretation is consistent with the entire statutory scheme of the MTSA. To be sure, the MTSA regulates general telephone solicitations which are defined by § 14- 2021 and dictates specific telephone solicitations that are exempt from contracting

21

requirements by § 14-2022. Those specific requirements contemplate situations in which the customer may call the merchant and a sale made pursuant to that call would be a "telephone solicitation," unless certain criteria were present that mitigated the potential for deception. Section 14-2022(a)(5) excludes from the MTSA consumer purchases made "pursuant to" marketing materials containing: "(i) The name, address, and telephone number of the merchant; (ii) A description of the goods or services being sold; and (iii) Any limitations or restrictions that apply to the offer." Additionally, §14-2022(b)(1) also exempts telemarketing offers for credit services where "the customer is required to call a telephone number," again contemplating that there are instances in which a sale is made through an inbound call.

The Commission gave deference to the CPD's interpretation of the MTSA. It stated that the clear intent of the MTSA, as argued by the CPD, is "to protect consumers who are subject to deceptive telemarketing tactics from being stuck with products or services that they ultimately do not want, or pursuant to terms that they did not understand or agree to." The plain language of the MTSA does not make an inbound/outbound distinction, and any such distinction "conflates the 'initiation' of the telephone call and the initiation of the attempt by the merchant to sell or lease consumer goods." It concluded that the MTSA was applicable to in-bound calls "instigated" by the merchant, and "especially those instigated by deceptive, false and misleading advertising." Given the legislative intent in conjunction with the plain language of the statute, it is reasonable to conclude the General Assembly intended the MTSA to include calls from consumers to merchants that were instigated by marketing brochures, such as SmartEnergy's post cards.

22

We conclude that, as the Commission found, SmartEnergy's conduct was a "telephone solicitation" as defined by the MTSA. SmartEnergy mailed out nearly six million postcards offering a "free month of electricity" and a six-month price protection plan if customers used the "eligibility code" provided. Those postcards also depicted language such as "Important Notice," "Redeem Before Date," "Time Sensitive," and "Act Now." The mailing of those postcards constituted initiation by SmartEnergy to solicit phone calls from prospective customers. It was only during those phone calls that the actual sale was made wherein the sales representative explained the terms and conditions of the service and other relevant information regarding the option to enroll in SmartEnergy's services. Therefore, the telephone call was initiated by SmartEnergy in mailing the postcards and soliciting a phone call, during which the entirety of the sale took place as defined by the MTSA. Accordingly, we conclude that the MTSA applies and next turn to whether SmartEnergy was exempt from the written contract requirement.

## B. SmartEnergy's Conduct Is Not Exempt from the MTSA's Requirements.

Although telephone sales are required to be reduced to writing signed by the customer and returned to the seller, CL § 14-2202 delineates certain transactions that are exempt. Relevant here, the contracting requirements do not apply to transactions where "the consumer purchases goods or services pursuant to an examination of a television, radio, or print advertisement or a sample, brochure, catalogue, or other mailing material of the merchant that contains: (i) the name, address, and telephone number of the merchant; (ii) a description of the goods or services being sold; and (iii) any limitations or restrictions that apply to the offer," or transactions in which the person making the solicitation "has a

23

preexisting business relationship with the consumer." CL § 14-2202(a)(2), (5). SmartEnergy argues its conduct is exempt from the MTSA's requirements because the consumer goods were purchased pursuant to a mailing material and there was thus a preexisting business relationship.

We reject SmartEnergy's contention that the Commission erred in finding both exemptions did not apply. As to the exemption wherein a consumer purchases goods pursuant to a mailing material, although the consumers called SmartEnergy in response to an examination of postcards that were sent by SmartEnergy, the contents of those postcards did not contain the requisite information to be exempt from the MTSA. Although the postcards listed the name, address, and telephone number of SmartEnergy, they failed to contain an accurate description of the services being offered. Nowhere did the postcards inform customers of the price of the fixed rate, the conversion to a variable rate after the six-month period, the qualifications for the offer, the limitations or restrictions that apply, or the information that their current utility service would be cancelled. Of note, the postcards did not indicate that anything was being sold. The postcards emphasized that the customers were "eligible" to receive the free month of service and a six-month price protection plan, obscuring that SmartEnergy was seeking to enroll customers in its retail electric supply. Thus, SmartEnergy is not exempt from the contracting requirements of the MTSA pursuant to this exemption as the information provided on the postcards was insufficient to satisfy § 14-202(a)(5).

SmartEnergy's contention that its conduct falls within the preexisting business relationship exemption is similarly without merit. It argues that, by sending the postcards

24

detailing the offer information, customers had an opportunity to review the advertisement, perform their own research, and decide to call SmartEnergy. That exchange, according to SmartEnergy, created a prior business relationship before the phone sale occurred. SmartEnergy's assertion that customers had an opportunity to research before making the decision to call is unsubstantiated and irrelevant, as prior opportunity to research does not create a business relationship and they posit no other means by which a preexisting business relationship would have existed. We hold the Commission did not err in declining to apply either exemption.

### C. Substantial Evidence Existed for the Board to Conclude SmartEnergy Engaged in Systemic Violations of Maryland Law.

Finally, SmartEnergy argues that the Commission's findings that it engaged in systemic practice of deceptive, misleading, and false trade practices are not supported by substantial evidence. In addition to its contention that it was not subject to the contracting requirement, SmartEnergy also maintains that the Board's findings as to four violations were in error: the postcards, the sales script, the processing of customer cancellations, and the monitoring and supervision of its agents' conduct. We examine each.

#### 1. Failure to comply with contracting requirements

We first hold that substantial evidence existed to support the Commission's finding that SmartEnergy violated the MTSA and COMAR 20.53.07 in failing to comply with the contracting requirements. As we have stated, in circumstances where a consumer received a sales pitch over the telephone, a contract, reduced to writing and signed by the consumer, is required. MTSA § 14-2203. This requirement is also reflected in the Commission's rules

25

and regulations, which set forth the material terms and conditions that must be contained in a retail contract, including that "[i]f the contract is completed through telephone solicitation, the supplier shall send the Contract Summary to the customer along with the contract that must be signed by the customer and returned as required by the [MTSA]." COMAR 20.53.07.08(B). Additionally, retail suppliers must also provide customers with a completed contract summary, when the contract is completed, "on the form provided by the Commission." COMAR 20.53.07.08(B). That form includes: electricity supplier information, price structure, supply price, statement regarding savings, incentives, contract start date, contract term/length, cancellation/early termination fees, and renewal terms.

As we have explained, SmartEnergy's conduct constituted telephone solicitations that were not exempt from the MTSA requirements. SmartEnergy neither sent its customers a written contract to sign and return, nor provided the customers with a contract summary on the form provided by the Commission. Such failures constitute violations of MTSA and COMAR regulations.

SmartEnergy contends that it substantially complied with the contract summaries required by COMAR in sending its Welcome Kit, and that its good faith efforts should be considered. However, as COMAR 20.53.07.08 explicitly states, the supplier must also comply with the contracting requirements outlined in MTSA, which SmartEnergy did not do. Moreover, it is not clear that every customer received a Welcome Kit, and those Welcome Kits that were received did not contain the items listed in the standard form pursuant to COMAR 20.53.07.08B. Though the kit contained the price structure and supply price during the six-month period, the welcome letter did not provide information on the

26

price structure after that six-month period ended, nor did it include the contract start dates and length, cancellation information, or renewal options. Though SmartEnergy contends that its Welcome Kits contained the required items after SmartEnergy was alerted to its violation in May 2019, any remedial measures taken were not sufficient and thus do not diminish SmartEnergy's failure to send contracts.

2. *Misleading and deceptive postcards*

We next hold that substantial evidence existed to support the finding that the postcards constituted a violation of the CPA, PUA § 7-505, and COMAR 20.53.07.07 prohibiting deceptive or misleading trade practices. PUA § 7-505(b)(7) and COMAR 20.53.07.07 mandate that an electricity supplier may not engage in marketing, advertising, or trade practices that are "unfair, false, misleading, or deceptive." Similarly, CPA §§ 13-301 and 13–303 prohibit false and misleading practices that have the capacity, tendency, or effect of deceiving or misleading consumers.

The postcards contained large print advertising "Free Month of Electricity on your [Utility] Bill." The customers' then-current utility was listed many times on the postcard, including language such as: "SmartEnergy for [Utility] Customers." It was only at the bottom of the postcard in smaller print that customers were informed that "SmartEnergy is a licensed supplier and not affiliated with [Utility.]" The postcards did not list information about price, and customers were not informed that the free month was contingent on six months of service after switching to SmartEnergy. Nor were customers informed that the free month was in the form of a reimbursement, rather than a credit. Additionally, the frequency with which the customers' utility name was mentioned, more frequently than

27

SmartEnergy and in some cases coupled with SmartEnergy, could, and often did, lead consumers to believe that the offer came from their current utility provider.[10] In fact, one customer's complaint filed with the Commission indicated that the postcard he received stated: "Dear [Customer] Congratulations! As a [town] resident, and a valued [Utility] Customer, you are eligible to receive the following: One Month of FREE Electricity. It's our way of saying Thank You. Please call now to claim this benefit." We hold substantial evidence in the record supports the Commission's finding that SmartEnergy's postcards constitute a misleading and deceptive practice in violation of consumer protection laws.

### 3. Misleading and Deceptive Sales Script

We similarly reject SmartEnergy's argument that there was not substantial evidence to find the sales script to be misleading or deceptive. As it did before the Commission, SmartEnergy argues that there were ten errors in the findings regarding the sales scripts: 1) statements misleading customers to believing they were dealing with current utility company, 2) the use of "SmartEnergy" implied to customers that they were using BGE's Smart Energy Program, 3) deflecting or not answering customer questions, 4) the failure to disclose all material terms over the telephone, 5) statements leading customers to believe that all their utility services would remain the same, 6) the reference to a six-month price

---

[10] SmartEnergy argues that the fact that the utility providers such as BGE, offer "Smart Energy Rewards" should not be held against it because the company name predates these programs. However, SmartEnergy could have clarified this distinction, particularly where the customers expressed confusion about whether SmartEnergy was affiliated with their utility provider, but SmartEnergy did not do so. Regardless of any timing of the programs' creation does not obviate SmartEnergy's deliberate obscuring of the distinction.

protection plan but not informing of rate after that six-month period, 7) script verifying the account number reinforced the deception that the price currently being paid would not increase, 8) statements implying the current rate would increase during high usage periods, 9) the statement that the call may be recorded for training and quality purposes was misleading, and  10) confirmation questions presenting new information.

Retail energy suppliers are responsible for the actions of their agents. COMAR 20.59.10.02(B). Where the agent is performing marketing and sales activities, the supplier is required to confirm that the agent has been properly trained. COMAR 20.59.10.04(A).

The Commission reviewed numerous recorded calls and was provided with extensive testimony and rebuttal testimony concerning those sales scripts and their representation of all calls by sales representatives. The transcripts before the Commission demonstrated that, during the sales calls, the representatives did not inform customers that SmartEnergy was not affiliated with their then-current utility provider. In fact, many customers expressed confusion about the relation between SmartEnergy and their utility provider. In response, SmartEnergy representatives did not provide any distinction, but instead dodged the questions. The representatives frequently used language such as "I do see here now that as a [utility] customer you are eligible," "congratulations on your free month for being a [utility] valued customer," all of which perpetuates the confusion regarding SmartEnergy's connection or lack thereof with other utilities. In one instance, a customer asked: "Is this one of the off companies because I don't want it if it's, if it's not a legitimate BGE company that I'm using right now," and the sales representative responded: "You will always continue to be a BGE customer." That same customer later

stated "I'm not changing companies ... So if that's what's up there, we need to stop," and the representative responded: "Like I said just continue making your payment to BGE as you always have." In another scenario, in discerning whether the offer was a "legitimate" offer from the utility provider, a customer repeatedly stated that she was a part of the "smart energy BGE" program, the representative responded "perfect" and did not clarify any distinction.

The sales representatives also failed to give all the material information over the phone. In addition to obscuring the lack of affiliation between SmartEnergy and the customers' current utility provider, SmartEnergy failed to affirmatively disclose that the customer would be required to leave the current utility. In addition, the customer was not informed of the actual fixed rate during the six-month period, or the fact that the rate would fluctuate after that period ended. In fact, it was not until the "confirmation questions" at the end of the phone call, that the agent represented to the customers for the first time that there was a fixed rate.

Nor did the representatives disclose the restrictions to qualify for the free month of electricity, specifically that the free month was only after six months of SmartEnergy's service. In one case, a representative told a customer "the only requirement is for you to stay with [utility]." In some instances, "only after repeated questioning by the caller" does the sales representative inform the customer that the free month of electricity is provided in the form of a check following the customer mailing in copies of three months of utility bills. The Commission found "[t]he audio recordings produced in this case are indicative of a pattern and practice by SmartEnergy's sales agents engaging in false and misleading

30

behavior by neglecting to fully explain the restriction applicable to customer's eligibility" for a free month of electricity, and such pattern and practices constitute violations of CL §§ 13-301 and 13-303.

The sales script also indicated that the sales representatives misled customers with the suggestion that, by opting into the six months of price protection, the price would not increase from their current rate. Additionally, if customers did not switch, the sales representatives implied that their rate would actually increase during high usage periods through statements such as "You will also get 6 months of price protection so that means the price you pay for the electricity will be protected and is not going to increase. This can give you peace of mind, especially during the high usage period like the winter/summertime, knowing that your rate won't go up." The sales representatives also often characterized the future energy period as "crazy high," whereas SmartEnergy's six-month rate was fixed. Notably, the sales representatives did not disclose that the price would fluctuate after that six-month period had ended. In fact, Baldwin testified that SmartEnergy created the impression that its offer would save the consumers money, but "at the time of the sales call the published utility rate was clearly known and *always lower* than the rate SmartEnergy offered." Therefore, "the sale of 'price-protection' was based on a knowingly false representation that *such service was needed* by the consumer."

Additionally, at the beginning of each monitored sales call, the sales representative stated that the call was being recorded for quality and training purposes. However, representatives would often restate immediately before the confirmation questions: "now I'm going to place this call on a recorded line." Baldwin opined that these calls were in fact

31

being recorded as a means of verifying the contract that SmartEnergy was seeking to confirm in its later confirmation questions. Of note, one customer filed a complaint with the Commission alleging that SmartEnergy enrolled her elderly mother without her mother's permission, and when she requested a copy of the phone recording, SmartEnergy "indicated they would call me in 48 hours with the recording. They did not." Another customer indicated that she had not enrolled in SmartEnergy, but when she called after receiving a bill, SmartEnergy informed her via the phone records that she enrolled on January 08, 2019 at 3:03p.m. The Commission found "this portion of the written sales script had the capacity or tendency to mislead customers into believing that the purpose of the recording was solely for quality and training purposes, rather than for purposes of verifying the caller's 'yes or no' response to the Supplier's two-question confirmation questionnaire." The Commission's findings that SmartEnergy's sales script was misleading and deceptive are supported by substantial evidence in the record.

### 4. "Thwarting" of cancellations

SmartEnergy next argues that the Commission's finding that it had "thwarted" customers' efforts to cancel their service was erroneous. Transcripts from call recordings demonstrated SmartEnergy sales representatives frequently made it difficult for customers to cancel. For example, one customer called SmartEnergy attempting to cancel because "[a]ll the agreement terms are too confusing," to which the representative's response was "You are cancelling without a reason." A different customer called and explained that she had previously tried to call to cancel and another representative would not let her cancel because she too did not have a good enough reason. Many of the complaints filed by the

32

customers cited failure to cancel their services. For instance, one customer called one week after enrollment to cancel, was placed on hold for 11 minutes, was instructed to leave a message and receive a call back, and was advised by his initial utility provider to call the Public Service Commission.

The transcripts from the call recordings contradict SmartEnergy's "confirmation question" informing customers of their right to cancel "at any time." Sales representatives told customers that their reasons for cancelling were insufficient, customers often had to go through numerous sales representatives to process cancellations, and many expressed confusion throughout the cancellation process. We hold substantial evidence exists to support the Commission's findings that SmartEnergy thwarted customers' cancellation attempts.

5. *Failure to monitor sales calls*

Finally, SmartEnergy argues that the Commission erred in finding that it failed to properly train its sales representatives and monitor those calls. Pursuant to COMAR 20.53.10.04A(1)–(9), a retail supplier must train its agents on applicable consumer protection laws and regulations, information pertaining to the supplier's services, customers' right to cancellation, the need to adhere to a script, and the supplier's contract summary. The supplier shall monitor those marketing and sales calls to "(1) Evaluate the supplier's training program; and (2) Ensure that agents are providing accurate and complete information, complying with applicable rules and regulations, and providing courteous service to customers." COMAR 20.53.10.04(F).

In response to consumer complaints, SmartEnergy prepared quality assurance sheets

evaluating the sales representatives' performance. Baldwin testified that, in comparing those assessments with her assessment of the misrepresentations for certain calls, SmartEnergy graded its representatives "quite leniently," and a representative who made material omissions and misstatements could still get passing marks on all criteria. She also stated that representatives frequently failed to follow a script directing certain text be read "verbatim," and that, had the calls been consistently reviewed, "those responsible for quality assurance would have noticed this regularly occurring omission and taken steps to correct it." The Commission concluded that the audio recordings "demonstrate a variety of 'off-script' messages" by sales agents, and the entirety of the record demonstrated that SmartEnergy failed to monitor its sales calls as required.

We hold that reasoning minds could reach the factual conclusion that SmartEnergy failed to monitor its agents' sales calls. Because substantial evidence in the record supports each of the Commission's findings regarding misleading and deceptive sales practices and failure to conform with Maryland consumer protection laws, we hold the Commission did not err in those determinations.

## III.  THE PENALTY WAS NOT ARBITRARY OR CAPRICIOUS.

SmartEnergy finally asserts that the penalty issued was arbitrary and capricious. To this end, SmartEnergy argues that it was improperly penalized for "relying on the Commission's own guidance and prior decisions." It further contends that, citing to several Commission decisions wherein a penalty was levied against a retail supplier in an amount less than that which was imposed here, the penalty was "wildly inconsistent with Commission precedent involving significantly more egregious conduct." Next,

34

SmartEnergy argues that the Commission improperly dismissed its selection bias argument, and the conclusions are therefore based on improperly extrapolated alleged wrongdoings. Last, SmartEnergy argues the Commission failed to consider any remedial measures taken by SmartEnergy.

Pursuant to COMAR 20.51.03.06, the Commission has the power to revoke or suspend a license if a company engages in deceptive practices. Similarly, PUA § 7-507(k)(1) dictates that the Commission "may revoke or suspend the license of an electricity supplier, impose a civil penalty or other remedy, order a refund or credit to a customer, or impose a moratorium on adding or soliciting additional customers by the electricity supplier." In determining an amount of the civil penalty, the Commission shall consider the number of previous violations, the gravity of current violations, and good faith effort of the electricity supplier. PUA § 7-507(l)(3). A reviewing court will not vacate "absent some showing of fraud or egregious behavior," or a finding that the sanction was "so extreme and egregious that the reviewing court can properly deem the decision to be 'arbitrary or capricious[.]'" *Spencer v. Md. State Bd. of Pharmacy*, 380 Md. 515, 531, 533 (2004).

SmartEnergy notes that there are three prior Commission decisions in which the Commission held that signed contracts were not required, and that the Commission's website indicates that customers may call an electricity supplier, who will then record the call and execute the "telephone contract, followed by sending a confirmation and copy of the contract." SmartEnergy asserts that the website does not reference a signature requirement. Prior Commission decisions and language located on the Commission's

35

website do not obviate the statutorily required conditions for an electric utility provider.

As to its selection bias argument, SmartEnergy argues that, in coming to its conclusion, the Commission listened to only a handful of the sales call recordings, and those calls are not representative of the 110,000calls received and 34,000 enrollments. However, Baldwin testified that the representatives on the sales calls Baldwin reviewed "comprised a substantial portion of SmartEnergy's sales force (at least two-fifths and most likely more) during the period when the consumer-complainants were enrolled." In addition, the calls were not confined to a short timeframe, but rather occurred over a period of 18 months. She stated that it is "highly likely that these practices were not limited to the consumers who later filed complaints;" rather, they "appear to have been part of a pattern that would likely extend to all or most of the consumers with whom [SmartEnergy] had contacted and eventually enrolled."

Per the Commission, SmartEnergy failed to present testimony on the issue of selection bias and therefore the PULJ was not obliged to consider the argument. However, the Commission also indicated that it reviewed the audio files submitted, as well as the "hundreds of pages [from the record] documenting SmartEnergy's training program and mandatory agent standards." It also stated: "SmartEnergy—which was in possession of all 34,000+ audio recordings from which [the Commission] and Staff's 'sample' was taken— had the ability, if it wished, to present an opposing sample" but did not do so. *See Md. Comm'n of Lab. & Indus. v. Bethlehem Steel Corp.,* 106 Md. App. 243, 263 (1994) (holding "the burden of proof is generally on the party asserting the affirmative of an issue before an administrative body."). Despite SmartEnergy's criticisms, the Commission had an

36

adequate factual basis to conclude that the sales calls to which it listened were representative of all of the calls. The Commission was not required to conclude the evidence was affected by selection bias. We discern no error with the Commission's conclusion.

The Commission found that SmartEnergy enrolled customers without a written contract or contract summary in violation of COMAR 20.53.07.08 and MTSA on thousands of occasions. The Commission further found that SmartEnergy engaged in marketing and trade practices that were unfair, false, misleading, or deceptive. It rejected SmartEnergy's argument that it took remedial measures. The fact that there may be other decisions by the Commission wherein a lesser penalty was levied for, what in SmartEnergy's view constituted "significantly more egregious" conduct, neither renders the remedy invalid, nor makes the remedy a violation of SmartEnergy's due process rights. The Commission's remedy was within its discretion, and we do not perceive the disgorgement of invalid customer enrollments to be extreme and egregious.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

37